Alina Veneziano
Arizona Bar Number 039347
Linda Julin McNamara (Admitted *Pro Hac Vice*)
Florida Bar Number 0714887
Oberheiden P.C.
13155 Noel Road, Suite 900
Dallas, TX  75240
Alina@federal-lawyer.com
Linda@federal-lawyer.com

*Attorneys for Relator Michelle Nemeh*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

United States of America,
*ex rel.* Michelle Nemeh,

     Plaintiff and Relator,

vs.                                                    No. Cv23-02009-Phx-JFM

                                                       **First Amended Complaint**

National Breathe Free Sinus &                          Jury Trial Demanded
Allergy Centers, LLC, d/b/a
Scottsdale Sinus and Allergy,
d/b/a Oasis Ear, Nose and Throat,
and d/b/a Premier Sinus & Allergy Center;
Capitol Breathe Free Sinus and
Allergy Centers, LLC; Arizona Breathe
Free Sinus & Allergy Centers, LLC;
Breathe Free of Fl, LLC; Breathe Free
Sinus & Allergy Centers of Florida, LLC;
SoCal Breathe Free Sinus & Allergy Centers
MSO, LLC; Dallas Breathe Free Sinus &
Allergy Centers, LLC; ; Trinity ENT  and
Facial Aesthetics, LLC; Manish Khanna, MD;
Nabiel Matthew Ghanem; and Taylor Borane,

     Defendants.
_____/

44
45

# FIRST AMENDED COMPLAINT

46      The United States of America *ex rel.* Michelle Nemeh files this action

47  against Defendants National Breathe Free Sinus & Allergy Centers, LLC

48  ("NBF"), d/b/a Scottsdale Sinus and Allergy, d/b/a Oasis Ear, Nose, and Throat,

49  and d/b/a Premier Sinus & Allergy Center; Capitol Breathe Free Sinus and

50  Allergy Centers, LLC; Arizona Breathe Free Sinus & Allergy Centers, LLC;

51  Breathe Free of FL, LLC; Breathe Free Sinus & Allergy Centers of Florida,

52  LLC; SoCal Breathe Free Sinus & Allergy Centers MSO, LLC; Dallas Breathe

53  Free Sinus & Allergy Centers, LLC; Trinity ENT and Facial Aesthetics, LLC;

54  Scottsdale Sinus & Allergy Outpatient Treatment Center, LLC; and Jupiter Sinus

55  & Allergy Center (collectively, the "NBF Defendants"), and against Manish

56  Khanna, M.D.; Nabiel Matthew Ghanem; and Taylor Borane (together with the

57  NBF Defendants, "Defendants"), and in support thereof alleges the following:

58          ## I.     NATURE OF THE ACTION

59      1.      This action arises out of Defendants' deliberate and far-reaching

60  conspiracy and  scheme to defraud the federal government and its healthcare

61  benefit programs by submitting and causing the submission of millions of dollars

62  in false claims throughout a nationwide group of affiliated medical clinics.

63  Relator brings this action to remedy the harm the Defendants have caused to the

64  United States of America by submitting claims through the Medicare, Medicaid,

65  TRICARE, and Medicare Advantage programs ("the government programs")

66  for balloon-sinuplasty procedures that the NBF Defendants certified and billed

67  to the government programs as medically necessary although no healthcare

68  provider had performed any medical necessity determination based on the

69  patients' actual symptoms, medical history, and diagnosis and although the NBF

70  Defendants had falsified patient medical records to support those fraudulent

71  medical-necessity certifications.

72        2.    In 2018, Defendants Khanna and Ghanem founded NBF in

73  Washington, D.C., purporting to provide a "world-class, state of the art, Ear

74  Nose & Throat healthcare experience while focusing on great patient outcomes."

75  https://www.nationalbreathefree.com, accessed on August 27, 2023. Dr. Khanna

76  serves as Chief Medical Officer ("CMO") for NBF; Ghanem, who has compared

77  running a medical practice to running a restaurant, serves as Chief Executive

78  Officer ("CEO"); and Borane serves as Chief Operating Officer ("COO").

79  Together, Khanna, Ghanem, and Borane knowingly devised and implement the

80  fraudulent practices and policies that are described in this Complaint and that

81  the NBF Defendants knowingly support and carry out.

82        3.    The remaining executives and high-level managers of NBF and its

83  affiliates are family, friends, and former co-workers of Ghanem and Borane,

84  most of whom have little or no experience in healthcare, billing, or compliance.

85  Before becoming NBF executives, Ghanem and Borane worked as medical-

86  device salesmen, selling sinus balloons to ENT physicians across the country.

87  Ghanem and Borane recruited other former sinus balloon sales representatives

88   to join NBF as managers or executives, and several of the ENT doctors to whom

89   they formerly sold sinus balloons are also now part of NBF.

90        4.    NBF's expansion began in 2020 in Dallas, Texas, with an affiliate

91   clinic started by Dr. Monty Trimble, and in Arizona, with an affiliate clinic

92   started by Dr. John Stewart, followed by a clinic established by Dr. Brian G. Lee

93   in early 2021. As of October 2025, NBF's website lists 30 "partner" clinics

94   across the country, including the NBF Defendants, among others.

95        5.    The NBF executives, including Ghanem, Borane, and Khanna,

96   provide training, billing support, and operational management to all of the NBF

97   Defendants so that each of them operates in the same fraudulent manner,

98   ordering, and performing as many balloon-sinuplasty procedures as possible

99   without regard to medical necessity, yet falsely certifying or causing the

100  submission of false certifications on claims for payment to the government

101  programs that the services were medically indicated and necessary for the health

102  of the patients. These claims were and are submitted in violation of the False

103  Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733. With clinics throughout the

104  country, NBF continues to grow its culture of fraud and deceptive practices via

105  a conspiracy and scheme to bill the government programs for the performance

106  of as many balloon-sinuplasty procedures as possible without complying with

107  its obligation to determine medical necessity before ordering those procedures

108  and seeking reimbursement for them from the government programs.

109    6.    On June 5, 2025, the United States filed a Notice of Non-

110 Intervention at this Time, Doc. 12. Relator continues this action on behalf of

111 herself and the United States.

112                           **II.    PARTIES**

113    7.    Relator Michelle Nemeh is a United States citizen and a resident

114 of Arizona. She has been a Physician Assistant ("PA") since 2018. She began to

115 work for NBF in 2021. As NBF requires of all NBF PAs at NBF affiliates

116 throughout the country, Relator participated in almost two weeks of NBF's

117 national training program in Washington, D.C. Thereafter, she worked at NBF

118 affiliates Scottsdale Sinus and Allergy and Trinity ENT in Gilbert, Arizona. She

119 brings this action as an original source based upon direct and unique information

120 she obtained during her employment.

121    8.    The United States is the real plaintiff in interest with respect to

122 the claims asserted in this matter.   The defrauded Medicare and Medicaid

123 programs are administered and supervised by the Centers for Medicare &

124 Medicaid Services, a division of the United States Department of Health &

125 Human Services. The defrauded TRICARE program is administered by the

126 Defense Health Agency, a division of the Department of War. Defendants'

127 conduct also resulted in the submission of false and fraudulent claims for

128 payment and statements in connection therewith submitted to other federally

129 funded health insurance programs administered by private insurance companies,

130    i.e., Medicare Advantage programs.

131        9.    Defendant NBF is a Delaware limited liability company that was

132    incorporated in 2019 and has its principal place of business at 4040 E Camelback

133    Road, Suite 102, Phoenix, Arizona 85018. Through counsel, it waived service

134    of the original complaint. It does business under various trade names, including

135    Scottsdale Sinus and Allergy Center in Scottsdale, Arizona; Oasis Ear, Nose,

136    and Throat in Surprise Arizona; and Premier Sinus and Allergy Center in Jupiter,

137    Florida.

138        10.    Defendant Capitol Breathe Free Sinus and Allergy Centers, LLC,

139    a Washington D.C. limited liability company, was formed in 2018, and has its

140    principal place of business at 2021 K St NW Suite 600, Washington, DC, 20006.

141    Through counsel, it waived service of the original complaint. Defendant Capitol

142    Breathe Free is the registered owner of the "National Breathe Free" trademark.

143        11.    Defendant Arizona Breathe Free Sinus & Allergy Centers, LLC,

144    an affiliate of NBF, is an Arizona limited liability company that was created in

145    2020 and has its principal place of business in Scottsdale, Arizona. Through

146    counsel, it waived service of the original complaint.

147        12.    Defendant Breathe Free of FL, LLC, an affiliate of NBF, is a

148    Florida limited liability company created in 2021 and whose only authorized

149    member is listed as NBF. Through counsel, it waived service of the original

150    complaint.

151       13.     Defendant Breathe Free Sinus & Allergy Centers of Florida, LLC,

152  an affiliate of NBF, is a Florida limited liability company created in 2020, whose

153  authorized members are NBF and Capitol Breathe Free Sinus & Allergy Centers,

154  LLC. Through counsel, it waived service of the original complaint.

155       14.     Defendant SoCal Breathe Free Sinus & Allergy Centers MSO,

156  LLC, an affiliate of NBF, is a California limited liability company created in

157  2021 with its principal place of business in Thousand Oaks, California. Through

158  counsel, it waived service of the original complaint.

159       15.     Defendant Dallas Breathe Free Sinus & Allergy Centers, LLC, is

160  a Texas limited liability company created in 2020 with its principal place of

161  business in Irving, Texas. Through counsel, it waived service of the original

162  complaint.

163       16.     Defendant Trinity ENT and Facial Aesthetics, LLC, is an Arizona

164  limited liability company created in 2009, with its principal place of business in

165  Gilbert, Arizona. It may be served through its registered agent, Veena Vats, 3485

166  South Mercy Road Suite 104, Gilbert, Arizona 85297.

167       17.     Each of the NBF Defendants submits claims for payment from the

168  government programs under its own discrete National Provider Identification

169  number.

170       18.     Defendant Dr. Manish Khanna is a citizen and resident of Virginia.

171  He is the CMO and co-founder of NBF. Through counsel, he waived service of

172  the original complaint.

COMPLAINT                                              7

173    19.    Defendant Nabiel Matthew Ghanem is a citizen and resident of

174    Arizona. He is the co-founder and CEO of NBF. Through counsel, he waived

175    service of the original complaint.

176    20.    Defendant Taylor Borane is a citizen and resident of Arizona. He

177    is the COO of NBF. Through counsel, he waived service of the original

178    complaint.

179    21.    All defendants who were previously served, who waived service,

180    or who are presented by counsel who has entered an appearance will be served

181    with this Amended Complaint by CM/ECF at the time of filing.

182    ### III.    JURISDICTION AND VENUE

183    22.    This Court has jurisdiction over all Defendants, including those

184    entities organized or operating outside the State of Arizona, pursuant to 31

185    U.S.C. § 3732(a), which provides that an action under the FCA may be brought

186    in any judicial district in which any one defendant can be found, resides,

187    transacts business, or in which any act proscribed by section 3729 occurred.

188    Defendants NBF, Arizona Breathe Free Sinus & Allergy Centers, LLC, Trinity

189    ENT and Facial Aesthetics, LLC, Scottsdale Sinus & Allergy Outpatient

190    Treatment Center LLC, are all registered in Arizona and transact business there.

191    Defendants Ghanem and Borane reside and work in Arizona, and all NBF

192    Defendants abide by and implement fraudulent policies and practices in

193    furtherance of the scheme and conspiracy to defraud described below.

194        23.    This Court has jurisdiction over this action under 28 U.S.C. § 1331
195    and 31 U.S.C. §§ 3732(a) and 3730(b), which provide this Court with original
196    jurisdiction to hear a *qui tam* action. Relator is an "original source" and brings
197    this action in the name of the United States as contemplated by the FCA, 31
198    U.S.C. §§ 3729-33.

199        24.    Venue is proper in this district because Defendants NBF, Arizona
200    Breathe Free Sinus & Allergy Centers, LLC, Trinity ENT and Facial Aesthetics,
201    LLC, Ghanem, and Borane can be found in, resides in, and/or transacts business
202    in this judicial district. Moreover, by virtue of their interaction with NBF, acts
203    prohibited by 31 U.S.C.§ 3729 have been committed by all Defendants in this
204    judicial district, making venue proper under 28 U.S.C. § 1391(c) and 31 U.S.C.
205    § 3732(a).

206        25.    There has been no public disclosure of the "allegations or
207    transactions" in this Complaint, including in any criminal, civil, or
208    administrative hearing, nor in any congressional, administrative or General
209    Accounting office or Auditor General's report, hearing, audit, or investigation,
210    or in the news media.  As detailed below, Relator has direct and personal
211    knowledge of such allegations and transactions.  To the extent that any such facts
212    thereof become public, Relator voluntarily provided disclosures of these
213    allegations and transactions to the United States pursuant to FCA requirements
214    prior to such public release or knowledge.

215

## IV.   FACTS

216

### A.  The Government Programs and Statutory Framework

217      26.      Medicare is a health-insurance program that is funded by taxpayer
218  revenue and administered by the United States government. The Centers for
219  Medicare & Medicaid Services ("CMS"), which is within the United States
220  Department of Health and Human Services ("HHS"), implements and oversees
221  the Medicare program. Medicare's purpose is to act as an insurance company in
222  providing medical care and durable medical equipment to persons aged 65 and
223  over, persons with a disability, and other persons who qualify for the program.

224      27.      Medicare Part B is a voluntary, subsidized insurance program
225  covering, *inter alia*, physicians' services, certain outpatient hospital care, and
226  laboratory services.  Part B's benefits are paid from the federal Supplemental
227  Medical Insurance Trust Fund, which is financed by individual premiums and
228  general federal tax revenues.

229      28.      Medicare Part B pays for "medical and other health care services"
230  provided by a physician, subject to specific exclusions. *See* 42 C.F.R. § 424.24.

231      29.      To bill Medicare Part B, a provider must submit a health
232  insurance claim form called the "Form 1500."  The provider who signs the form
233  certifies on the claim form both that the claimed services were provided and "that
234  the services shown on th[e] form were medically indicated and necessary for the
235  health of the patient." That certification affirms that the provider has considered
236  the underlying patient's actual medical history, complaints, and diagnosis, along

237  with any relevant medical documentation and has determined, based on that
238  review, that the billed service was medically indicated and necessary for the
239  health of the patient. When diagnostic data underlying a provider's medical-
240  necessity certification has been purposefully disregarded or falsified, the
241  provider's certification of medical necessity is also false.

242      30.     Further, provider and facility agreements with Medicare, signed by
243  payees, contain an agreement to comply with all Medicare requirements
244  including the fraud-and-abuse provisions.  A provider who fails to comply with
245  these statutes and regulations, including those that permit billing only for
246  medically necessary procedures, is not entitled to payment for services rendered
247  to Medicare patients.

248      31.     Medical necessity is always a statutory prerequisite to CMS and
249  other federal-program reimbursement for any medical service, including balloon
250  sinuplasty. *See* 42 U.S.C. § 1395y(a)(1)(A). No payment may be made under
251  Medicare Part B for services that "are not reasonable and necessary for the
252  diagnosis or treatment of illness or injury or to improve the functioning of a
253  malformed body member." *Id*.

254      32.     Moreover, "[f]or Medicare to consider coverage and payment for
255  any item or service, the information submitted by the supplier or provider must
256  corroborate the documentation in the beneficiary's medical documentation and
257  confirm that Medicare coverage criteria have been met." *See* Medicare Program
258  Integrity Manual, § 3.3.2.1 (Rev. 13008; issued 12-18-24).  Healthcare providers

259    are required to "[s]ubmit enough documentation to support [their] claims." *See*

260    https://www.cms.gov/files/mln909160-complying-with-medical-record-

261    documentation-requirements.pdf. Whether or not there is a National or Local

262    Coverage Determination as to a particular service or procedure, a patient's

263    medical records must show that the service provided was medically necessary.

264    *See* 42 C.F.R. § 412.46(b); *see also* 42 C.F.R. §§ 412.3(d)(1)(i), 412.3(d)(3));

265    https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-

266    MLN/MLNProducts/Downloads/Items-and-Services-Not-Covered-Under-

267    Medicare-Booklet-ICN906765.pdf (instructing providers, "For each service you

268    bill, indicate the specific sign, symptom, or patient complaint that makes the

269    service reasonable and necessary."); https://www.cms.gov/files/mln909160-

270    complying-with-medical-record-documentation-requirements.pdf ("We pay for

271    services when the medical record documentation supports Medicare

272    coverage[.]"). Because Medicare only pays for services "when the medical

273    record documentation supports Medicare coverage," every certification of

274    medical necessity included in a claim for payment inherently certifies that the

275    medical-record documentation underlying the claim supports coverage.

276        33.    The medical-necessity-requirement exists independently of any

277    National or Local Coverage Determination, and "every Medicare claim includes

278    an express or implied certification that treatment was medically necessary."

279    *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d

280    1108, 1114 (9th Cir. 2020). Medicare requires that services

281    provided/ordered/certified be authenticated by the persons responsible for the

282    care of the beneficiary in accordance with Medicare's policies. *See* Medicare

283    Program Integrity Manual, section 3.3.2.4.

284           34.    To administer Medicare, CMS uses Medicare Administrative

285    Contractors ("MAC"). A MAC is a private healthcare insurer that has been

286    awarded a geographic jurisdiction to process Medicare Part A and Part B

287    medical claims. CMS relies on a network of MACs to serve as the primary

288    operational contact between the Medicare Fee-For-Service program and the

289    healthcare providers enrolled in the program.  MACs are multi-state, regional

290    contractors responsible for administering both Medicare Part A and Medicare

291    Part B claims.

292           35.    Medicare Advantage, also known as "Part C" of the Medicare

293    program, is a federally funded health-insurance program established under the

294    Medicare Act. It allows private insurance companies, known as Medicare

295    Advantage Organizations ("MAOs"), to administer Medicare benefits to eligible

296    individuals. Instead of the federal government paying directly for each medical

297    service under traditional Medicare, CMS pays these private insurers a fixed

298    monthly amount for each enrolled beneficiary. These payments come entirely

299    from federal funds appropriated for the Medicare program. Therefore, false

300    claims submitted to a Medicare Advantage program constitute false claims for

301    payment of federal funds.

302    36.    Medicare Advantage plans are required by federal law and

303    regulation to provide their enrollees with all benefits available under traditional

304    Medicare Parts A and B. A service is "Medicare-covered" only if it is reasonable

305    and necessary for the diagnosis or treatment of illness or injury. If a service

306    would not be considered medically necessary under traditional Medicare, it is

307    also not reimbursable under a Medicare Advantage plan. In addition, all

308    Medicare Advantage plans must follow the same fundamental documentation

309    standards as traditional Medicare. *See* 42 C.F.R. § 422.504(a) (requiring all

310    MAOs to comply with Medicare requirements and conditions).

311    37.    Medicaid is a health-insurance program that is funded by taxpayer

312    revenue and administered by the United States government and state

313    governments. Medicaid is designed to assist participating states in providing

314    medical services, durable medical equipment, and prescription drugs to

315    financially needy individuals who meet certain income requirements. The

316    program is overseen by CMS and DHS. Each state may have its own Medicaid

317    rules, but all states require that the services rendered and billed must be

318    medically necessary.

319    38.    TRICARE is a health-insurance program for active-duty military

320    members and some former military members, including retired military

321    personnel age 65 and over through the Tricare for Life Program. The purpose of

322    TRICARE is to implement a comprehensive managed healthcare program for

323    the delivery and financing of healthcare services for military members and their

324  dependents.  TRICARE is funded by taxpayer revenue and administered by the

325  United States government. The program is overseen by the Department of War

326  through the Defense Health Agency. Again, medical services are covered only

327  if they are medically necessary.

328       39.    All government healthcare programs, including Medicare,

329  Medicaid, TRICARE, and Medicare Advantage require sufficient

330  documentation in the provider's or hospital's records to verify the services

331  performed were "reasonable and necessary" and required the level of care billed.

332  "Providers are responsible for documenting each patient encounter completely,

333  accurately, and on time." https://www.cms.gov/medicare/medicaid-

334  coordination/states/dcoumentation-matters-toolkit. According to section

335  30.6.1(A) of the Medicare Claims Processing Manual, "[T]he service should be

336  documented during, or as soon as practicable after it is provided, to maintain an

337  accurate medical record." and, according to section 3.3.2.5 of the Medicare

338  Program Integrity Manual, "All services provided to beneficiaries are expected

339  to be documented in the medical record at the time they are rendered." Most

340  MACs and state Medicaid programs require that documentation of clinical notes

341  be completed within 24–48 hours of the patient's visit.

342       40.    If entries relating to services were not properly documented at the

343  time of services and need to be amended, corrected, or entered after the services

344  were rendered, "[t]he date and author of any amendment, correction or delayed

345  entry should be identifiable, and the change/addenda should be clearly and

346  permanently denoted." *See* Medicare Program Integrity Manual, section 3.3.2.5.

347      41.    The False Claims Act as set out in 31 U.S.C. § 3729(a)(1), *et seq*.

348  (the "FCA"), prohibits knowingly presenting, or causing to be presented, or

349  conspiring to present to the United States any false or fraudulent claim for

350  payment. Further, as set out in 31 U.S.C. § 3729(a)(2), the FCA prohibits

351  knowingly presenting, causing to be presented, or conspiring to make or use a

352  false record or statement to obtain payment or approval for a false or fraudulent

353  claim.

354      42.    Each violation of the FCA is a violation of federal law that is

355  punishable by three times the amount of the actual damages sustained by the

356  government, as well as a civil penalty of between $14,308 to $28,619 per claim

357  for violations that occurred after November 1, 2015, and for which penalties are

358  assessed after January 15, 2025.

359      43.    Under the FCA, the term "knowingly" means that a person, with

360  respect to information, (1) has actual knowledge of the information; (2) acts in

361  deliberate ignorance of the truth or falsity of the information; or (3) acts in

362  reckless disregard of the truth or falsity of the information. The FCA does not

363  require proof of a specific intent to defraud.

364      44.    As described below, under the direction of Ghanem, Borane, and

365  Khanna, and in furtherance of their conspiracy and scheme to defraud the

366  government programs, the NBF Defendants' systemic policy and practice is to

367  convince as many patients as possible at every NBF Defendant facility to

368  undergo a balloon-sinuplasty procedure without any consideration of medical

369  necessity; to have non-medical personnel alter patients' medical records to

370  bolster the ordering of that procedure even when doing so requires the inclusion

371  of false information; and to fraudulently bill—or cause to be billed—a

372  government program for the procedure in violation of the FCA without regard

373  to either medical necessity or the fact that the underlying documentation has

374  been falsified to support the claim that the procedure was medically indicated

375  and necessary for the health of the patient. The Defendants have for years acted

376  in concert to submit and cause the submission of false and fraudulent claims and

377  records to the government programs to obtain payment, in violation of the FCA.

**B.  Defendants' Conspiracy and Scheme to Submit False Certifications of Medical Necessity in Support of Claims for Payment for Balloon Sinuplasty Procedures**

382  45.    In 2005, the FDA approved the use of balloon sinuplasty, also

383  known as balloon-catheter-dilation surgery, as a procedure to clear blocked

384  sinuses. It is intended for patients who have chronic sinusitis and for whom

385  medical interventions have failed. The procedure involves the insertion of a slim

386  and flexible balloon catheter into a patient's sinus cavity under local anesthesia.

387  The balloon is then slowly inflated to expand the sinus opening and, when

388  removed, leaves the sinus passage widened and free of built-up pressure to

389  improve sinus drainage. For patients who truly need the procedure, it can provide

390  great benefit.

391        46.    Balloon sinuplasties range in cost from $5000 to more than

392   $14,000 or more and are covered by many private insurance companies as well

393   as by Medicare Part B, Medicaid, TRICARE, and Medicare Advantage, but only

394   when they are medically necessary. Generally, both private payors and

395   government programs consider these procedures to be "medically necessary"

396   when a patient has recurrent sinus infections that do not respond to medication,

397   intractable sinus pain, and/or an affected area limited to specific sinuses,

398   including those in the cheeks, forehead, or back of the nose. Patients who have

399   acute sinus issues, those who respond completely to medication or to allergy

400   treatment, or those whose problems are caused by polyps or a deviated septum

401   are not good candidates for the procedure, and, because the procedure is meant

402   for those whose issues cannot be addressed by medication or other conservative

403   measures, most insurance companies, including the government programs,

404   consider whether the patient has been treated with conservative measures as well

405   as antibiotics on one or more occasions within the past year before approving

406   payment for the balloon-sinuplasty procedure. Common conservative measures

407   include sinus rinses, steroid sprays such as Flonase, antihistamines, and

408   antibiotic use.

409        47.    Although Medicare does not yet have any National or Local

410   Coverage Determination for balloon sinuplasty, coverage under all government

411   programs is subject to standard medical-necessity guidelines and is dependent

412   upon quality supporting clinical notes and sufficient documentation. Because

413  there is no existing coverage determination, it is especially important for any

414  claim for this service to be backed by clear documentation supporting a

415  healthcare provider's determination of medical necessity. *See*

416  https://www.cms.gov/files/mln909160-complying-with-medical-record-

417  documentation-requirements.pdf ("We pay for services when the medical record

418  documentation supports Medicare coverage, coding, and billing requirements.").

419      48.    Knowing this, Ghanem, Borane, and Khanna devised an unlawful

420  agreement and scheme to violate the FCA by (1) inducing as many patients as

421  possible at all NBF affiliates, including at the NBF Defendants, to undergo a

422  balloon-sinuplasty procedure without any determination of medical necessity;

423  (2) creating false records regarding the patients' underlying symptoms and

424  medical history to create an illusion that the procedure had been ordered based

425  on a determination of medical-necessity rather than on a desire for profits; and

426  (3) billing or causing the billing of the government programs for these

427  procedures as if the procedures had been ordered based on medical necessity and

428  an evaluation of the patients' actual medical history, symptoms, and diagnosis,

429  when in fact they were not. As Ghanem, Borane, and Khanna created and

430  oversaw each new NBF clinic, including the NBF Defendants, Ghanem, Borane,

431  and Khanna added each clinic as a party to their conspiracy by, as described

432  below, overseeing their operations and requiring them to conform with and

433  participate in NBF's fraudulent practices. All of the NBF Defendants do so with

434  knowledge and intent to violate the FCA.

49.    In furtherance of the first part of the scheme, the NBF Defendants, under the direction of Ghanem and Borane, and with the knowledge and support of Khanna, hire physician assistants ("PAs") to provide the primary patient interactions with NBF patients. NBF and its affiliates also hire medical assistants to help with entry-level clinical and administrative tasks. On information and belief, Ghanem and Borane, with the support and knowledge of Khanna, encourage all NBF Defendants to hire PAs and medical assistants who lack prior experience in the ear, nose, and throat ("ENT") field of medicine because, due to their lack of ENT expertise, they are unlikely to question NBF's instructions and practices.

50.    Once a PA has been hired to work at any of the NBF affiliates including the NBF defendants, the NBF Defendants, under the direction of Ghanem and Borane and with the knowledge and support of Khanna, require each newly hired PA to undergo training in Washington, D.C., under the direction of Lauren Wills, NBF's Director of Clinical Development. This training includes education about sinuses and treatment options, focusing on the balloon-sinuplasty procedure, as well as "talk tracks" that the PAs are directed to use with every patient who walks through the door of an NBF-affiliated clinic, regardless of the reason for the patient's visit. As the CMO, Khanna has the PA trainer emphasize to the PAs the importance of using these canned "talk tracks" when introducing the balloon-sinuplasty procedure to all patients during their first visit to induce them to agree to undergo the procedure.

457    51.    During the training and afterward, NBF executives and managers,

458    including Ghanem, Borane, and Khanna, instruct PAs that all patients they see

459    should book a balloon-sinuplasty procedure during their first visit, and they tell

460    the PAs that "the goal is to book them before they leave the office." These

461    executives and managers, including Ghanem, Borane, and Khanna, either

462    directly or through others, train the PAs that these procedures are appropriate

463    regardless of the patient's underlying complaint or diagnosis; in other words,

464    regardless of medical necessity. Indeed, Khanna told Relator that he was in a

465    contest with another NBF physician to see how many balloon-sinuplasty

466    procedures would be completed at their respective NBF facilities.

467    52.    The first part of the scheme continues once the PAs begin

468    practicing at any NBF clinics, including any of the NBF Defendants. The NBF

469    Defendants, along with Borane, Ghanem, Khanna, set specific expectations for

470    all NBF affiliates regarding how many patients should undergo balloon

471    sinuplasties. With no concern for medical necessity, Borane, Ghanem, Khanna,

472    directly and through other NBF managers and administrators, instruct PAs and

473    other medical providers that they should schedule a balloon sinuplasty during

474    the first appointment for at least 80% of all patients whose primary complaint is

475    sinus related and for at least 50% of all patients whose primary complaint is not

476    sinus related. Because of this expectation, Borane and Ghanem, either directly

477    or through other administrative personnel, demand to know why patients who

478    have not scheduled balloon-sinuplasty procedures with their patients have failed

479    to do so. In furtherance of the scheme, they penalize PAs and other medical

480    providers who do not schedule "enough" sinuplasty procedures by scheduling

481    them to see fewer patients and by threatening to fire them (and actually firing

482    them). Meanwhile, they reward the PAs and other medical providers who

483    schedule the most procedures by, among other methods, doling out Rolex

484    watches during NBF's lavish annual convention in Las Vegas and other

485    conferences that are attended by NBF providers throughout the entire NBF

486    network of clinics. Indeed, at a Scottsdale, Arizona, conference in September

487    2022, a PA from Capitol Breathe Free Sinus and Allergy Centers was rewarded

488    with a Rolex watch because she had the highest rate of any PA in the NBF-

489    affiliate network of convincing patients who came to the clinic with non-sinus

490    complaints to undergo sinuplasty procedures. Another PA from Capitol Breathe

491    Free Sinus and Allergy Centers was rewarded with a Rolex for having the most

492    patients at a NBF affiliate undergo a balloon sinuplasty. Administrators and

493    providers receive monetary bonuses generally once a month if bookings remain

494    high.

495        53.    The second part of the scheme involves the falsification of patient

496    electronic medical records to create an illusion that the ordering provider

497    considered and determined medical necessity before ordering a balloon

498    sinuplasty. The NBF Defendants do this because the government programs will

499    consider and pay for a medical service only if the beneficiary's true and correct

500    medical documentation confirms that, as certified on the claim for payment, the

501  billed service is medically necessary. Although each NBF PA who examines a

502  patient creates an electronic clinical note during or immediately following each

503  patient visit, recording the patient's condition, symptoms, and concerns and

504  documenting the PA's observations, assessments, and diagnoses, the NBF

505  Defendants' executives and managers, including Ghanem, Borane, and Khanna,

506  train and require PAs not to sign their clinical notes. Instead, they require the

507  PAs, nurse practitioners, and physicians who examine the patients to "save" their

508  notes in the electronic system, but never to finalize and close them by "signing"

509  them with their electronic signature.

510      54.    The NBF executives and managers, including Ghanem, Borane,

511  and Khanna, impose this requirement so that non-clinical employees of the NBF

512  Defendants, including employees referred to as "Auth Teams," can review,

513  change, and falsify the medical providers' electronic clinical notes—sometimes

514  days or even weeks later—to falsify the patient's primary complaint, to remove

515  comments about prior allergy testing or referrals, to show falsely that the patient

516  has experienced symptoms that they did not in fact report, and to include or omit

517  other information that is material to the medical necessity of a balloon-sinuplasty

518  procedure, such as whether the patient has taken any antibiotics in the past year

519  or whether the patient has nasal polyps. Ghanem, Borane, and Khanna instruct

520  the PAs directly and through their administrative staff to ask patients if they

521  could "remember ever taking antibiotics in the past," and that, if the patient

522  identifies any antibiotic that they have taken at any point in their life, the PA

523  should add that antibiotic to the clinical note, falsely suggesting that the patient

524  was previously unsuccessfully treated with antibiotics for sinus maladies.

525      55.    By having the PAs lie in their clinical notes about patients' use of

526  antibiotics, and by having non-medical personnel change and falsify the

527  providers' clinical notes, the NBF Defendants, under the direction of Ghanem,

528  Borane, and Khanna, purposefully cause the creation of false documentation at

529  all NBF affiliates, including the NBF Defendants, purporting to show that a

530  healthcare provider determined, based on an actual medical assessment, that a

531  balloon sinuplasty was medically necessary, even though, pursuant to the NBF

532  Defendants and Borane's, Khanna's, and Ghanem's conspiratorial agreement

533  and scheme with the NBF Defendants, the patient was destined to undergo the

534  procedure the moment he or she scheduled an appointment at the NBF clinic,

535  long before any medical assessment occurred.

536      56.    Also in furtherance of the scheme, Ghanem, Borane, and Khanna

537  directly or through others, instruct PAs at all NBF affiliates including the NBF

538  Defendants to prescribe antibiotics for their patients but to tell those patients *not*

539  to take the antibiotics prior to surgery. They instruct the PAs to tell the patients

540  to save the antibiotics for use post-procedure or for some other later purpose.

541  Indeed, the written training materials for NBF's "procedure coordinators" at all

542  NBF affiliates including the NBF Defendants explicitly instruct the coordinators

543  to tell each patient that, due to insurance requirements, "we will send you an

544  antibiotic today; just pick it up and save it for your procedure." These materials

545    reveal that the NBF Defendants do not prescribe the antibiotics to treat patients

546    or to provide them relief from their sinus-infection symptoms in the most cost-

547    effective fashion. Instead, they prescribe these medications merely to bolster the

548    false narrative in the patients' medical documentation that patients have tried

549    less expensive means of treating their symptoms before resorting to balloon

550    sinuplasty—again in an attempt to bolster the false appearance of medical

551    necessity for the procedure. This fraudulent practice also is intended to increase

552    the remuneration that the NBF Defendants obtain by obtaining reimbursement

553    from the government programs for as many balloon-sinuplasty procedures as

554    possible, as quickly as possible, without regard to whether other the patient could

555    be treated in a less expensive and less invasive manner.

556        57.    Also under the direction of Ghanem, Borane, and Khanna, NBF

557    non-medical personnel at all NBF affiliates including the NBF Defendants create

558    documents called "Z-Auths," which are templated notes that are merged into the

559    patient records and that are formatted to appear to be office-visit notes. Despite

560    that the documents bear the heading "Summary of Medical Necessity for

561    Procedural Intervention," Z-Auths are not notes created or reviewed by the

562    healthcare provider who evaluated the patient and ordered the balloon

563    sinuplasty, memorializing the provider's medical-necessity determination.

564    Instead, Z-Auths are forms that non-clinical Auth Team members merge into a

565    patient's clinical notes to falsely suggest that a PA or physician whose electronic

566    signature is falsely appended to the document actually determined, based on the

patient's symptoms and medical history, that a balloon-sinuplasty procedure was medically necessary. The Z-Auths frequently add false information to the actual medical note that was created by the PA or physician regarding the patient's symptoms, medical history, and other information that is material to a determination of the medical necessity of a balloon-sinuplasty procedure and consequently that is material to a government payor's decision of whether to pay for the procedure.

58.    Under Ghanem, Borane, and Khanna's direction, the NBF Defendants direct their non-medical personnel to falsify patient records in these ways both for patients covered by private insurance and for those whose medical care is paid for by a government program.

59.    Once a patient's clinical note has been edited and falsified sufficiently to support coverage by the patient's government or private insurer, a non-medical NBF employee affixes the electronic signature of an NBF physician or PA to the note to use as support for the claim for payment submitted to the pertinent government or private insurance program. Along with other NBF physicians, Dr. Khanna allows his electronic signature to be used in this way, knowing that many of the notes contain false information. In many cases, the note bearing a provider's forged electronic signature contains contradictory or entirely false information as a result of the edits and bears little resemblance to the note created by the provider who actually saw and evaluated the patient and created, but did not sign, the original note.

589   60.   The NBF Defendants are able to have their employees falsify

590   clinical notes in this way because Ghanem, Borane, and Khanna, directly and

591   through others, instruct the PAs never to sign their own clinical notes, and they

592   do not give the PAs any opportunity to review their edited clinical notes before

593   those notes are "signed" before the claims for services backed by those notes are

594   submitted to federal payors for reimbursement. All notes remain open and

595   unsigned in the patients' medical records.

596   61.   NBF's billing team, Auth Teams, and office managers comb over

597   every clinical note supporting every balloon-sinuplasty order, adding or deleting

598   information as necessary, regardless of truth or falsity, to ensure that, when the

599   procedure is billed, the government or private payor will not question the

600   procedure's medical necessity. In defiance of section 3.3.2.5 of the Medicare

601   Program Integrity Manual, none of the NBF personnel who edit clinical notes in

602   this way indicate the date and author of the changes and what changes were

603   made.

604   62.   Until 2023, NBF medical providers could review some, but likely

605   not all, of their clinical notes and the manner in which they had been revised via

606   a "contraindication tab" in each patient's electronic medical record. In

607   furtherance of the scheme, however, the NBF Defendants, under the direction of

608   Ghanem and Borane, discontinued use of the contraindication tab in 2023,

609   making it nearly impossible for the PAs, nurse practitioners, and physicians to

610    view the exact ways in which NBF's non-medical personnel or others had

611    changed their clinical notes.

612        63.    On one occasion, Ghanem's brother, Andrew Ghanem, an NBF

613    administrator who has no medical training, suggested specific language for a

614    doctor to use in a peer-to-peer review with an insurance company's doctor to

615    obtain approval for the balloon-sinuplasty procedure. While admitting that the

616    insurance company's initial denial of the procedure due to chronic rhinosinusitis

617    was legitimate, Andrew noted that the peer-to-peer doctor who would participate

618    on behalf of the insurance company did not know anything about ENT services.

619    He therefore suggested the NBF doctor to get "creative" and to say that the sinus

620    procedure would assist in resolving the patient's ear problem (eustachian tube

621    dysfunction). He went on to recommend telling the insurance company that the

622    patient might lose their hearing if the balloon sinuplasty was not performed.

623    Needless to say, none of Andrew's "medical" ideas contained in that email had

624    any basis in scientific reality. The email demonstrates the lengths to which NBF

625    executives and administrators would go to obtain insurance coverage for

626    balloon-sinuplasty procedures and is just one illustrative example of Defendants'

627    efforts to prioritize profits over patient care.

628        64.    Once the non-clinical personnel or others have falsified the

629    providers' clinical notes whenever necessary to make a balloon-sinuplasty

630    procedure appear to be medically necessary for the treatment of illness under the

631    pertinent government program's considerations or requirements, and after those

632    notes have been fraudulently "signed" with the credentials of a medical provider

633    who never reviewed and approved the falsified notes, the pertinent NBF

634    Defendant submits or causes the submission of a claim for payment to the

635    pertinent government program for the patient's balloon-sinuplasty procedure,

636    with each claim including an express certification that the procedure was

637    medically indicated and necessary for the health of the patient and an implied

638    certification that the true and accurate medical documentation underlying the

639    claim supports coverage. Because these certifications are always a prerequisite

640    to payment by a government program, and because the NBF Defendants submit

641    or cause the submission of these certifications without any determination of

642    medical necessity, regardless of medical necessity, and based on falsified

643    underlying medical documentation, these certifications are both false and

644    material to the government programs' coverage determinations and payment

645    decisions. If the pertinent government program had known that the provider

646    ordering the balloon sinuplasty had not independently determined medical

647    necessity before deciding whether to order the procedure, or had known that the

648    documentation underlying the claim supposedly establishing medical necessity

649    was materially false, that program would not have paid for those claims. Each

650    bill submitted to one of the government programs including these false express

651    and implied certifications was and is fraudulent under the FCA.

652         65.    Presented with these false certifications and claims for payment,

653    Medicare, Medicaid, TRICARE, and Medicare Advantage have paid and

654 continue to pay amounts ranging from $5000 to more than $14,000 for each

655 balloon sinuplasty performed on each patient covered by a government program,

656 unaware that, as to many if not most of the procedures performed at an NBF

657 Defendant facility, no medical-necessity determination had been done by a

658 healthcare provider before the procedure had been ordered; the medical

659 documentation underlying the claim had been falsified regarding the factors

660 material to a medical-necessity determination; and the procedure was not in fact

661 medically necessary. If the government programs had known these things, those

662 programs would not have paid the NBF Defendants' claims.

663 66.    In 2022 and 2023, all or most of the NBF clinics, including the

664 NBF Defendants, performed balloon-sinuplasty procedures on between one and

665 forty patients insured by a government program each month. Since 2018, relator

666 estimates that CMS and TRICARE  have paid the NBF Defendants tens of

667 millions of dollars in reimbursements for claims for balloon-sinuplasty

668 procedures that were based on false medical-necessity certifications, that were

669 in fact not reasonable and necessary for the treatment of any illness, and that

670 were supported by medical records containing false information material to a

671 medical-necessity determination and forged provider signatures.

672 **C.    Defendants' Additional Fraudulent Practices in Furtherance of**
673 **the Conspiracy**
674
675 67.    As described above, the NBF Defendants' business model depends

676 on fraud, which permeates NBF's corporate structure and all of its affiliates,

677    including the NBF Defendants. As NBF's CEO, Ghanem appears on a podcast

678    prominently showcased on NBF's webpage, www.nationalbreathefree.com, in

679    which he promises to explain "how running a medical practice is like running a

680    restaurant." Indeed, as explained above, that is precisely what Ghanem and

681    Borane do—they run the NBF Defendants in the same way that they would run

682    a restaurant, seeking to sell the highest-revenue product to all of its customers

683    regardless of medical need. But healthcare, especially when it is paid for by the

684    taxpayers through government insurance programs, should not be treated as

685    merely a profit-driven enterprise. The care and health of the patients and the

686    proper stewardship of public monies, rather than personal and corporate profits,

687    should be of paramount importance.

688        68.    Yet, to increase the profits from their conspiracy and fraud

689    scheme, the NBF Defendants also fraudulently bill for stents in connection with

690    all balloon-sinuplasty procedures, regardless of whether those stents are

691    medically necessary or even whether stents were used at all. Doctors sometimes

692    place stents in a patient's sinuses after a balloon sinuplasty or other sinus

693    surgery. Such nasal stents help keep the sinuses open during healing. However,

694    most patients find them uncomfortable, and not all patients require them.

695    Typically, when stents are used, the physician places one stent on each side, for

696    no more than a total of two.

697        69.    Borane and Ghanem learned, however, that Medicare and other

698    government programs, as well as some private insurers, would pay for up to six

699    stents per sinus procedure. After Borane and Ghanem learned this information,

700    the NBF Defendants began adding six stents to every bill submitted for a balloon

701    sinuplasty, whether the patient had received two stents, one stent, or no stents at

702    all. Indeed, Borane billed his own insurance company in 2020 and 2021 for a

703    balloon sinuplasty supposedly performed on him, along with the use of six

704    stents, even though the clinic where such procedures supposedly occurred,

705    Arizona Breathe Free, has no records that any such procedures were scheduled

706    or completed.

707            70.     Borane and Ghanem eventually realized that claiming the use of

708    six stents for every patient might raise suspicion. Therefore, to "prevent an

709    audit," the NBF Defendants began adding four stents per procedure to some

710    bills, five stents to others, and six stents to others, even when the use of those

711    stents had not been medically necessary or when no stents, or fewer stents, had

712    been used. To make as much money as possible in connection with the

713    conspiracy and scheme to defraud, the NBF Defendants, under the direction of

714    Borane and Ghanem, billed these stents to the government programs and private

715    payors or caused these stents to be billed to the government programs.

716            71.     For example, patient W.R., who was 90 years old at the time,

717    visited Premier Sinus and & Allergy Center in Jupiter, Florida, in 2023. A

718    physician there performed a balloon sinuplasty on each side of his sinuses. The

719    claim that Premier Sinus and & Allergy Center sent, or caused to be sent, to

720    Medicare for W.R.'s procedure falsely included a charge for six units of Propel

721    Contour stents. On information and belief, the physician who performed the

722    procedure did not in fact place six stents into the sinuses of this elderly patient.

723         72.    The NBF Defendants further fraudulently inflate their balloon-

724    sinuplasty claims by improperly coupling that procedure with two separate but

725    concurrent procedures. The first, submucosal resection of turbinates ("SMRT"),

726    involves the reduction of small structures in the nose that cleanse and humidify

727    air as it passes through the nostrils into the lungs to improve breathing. The

728    second added procedure, reduction of septal swell bodies, also involves a

729    diminution of part of the nasal anatomy and is used to improve congestion and

730    swelling from allergies. For every patient scheduled for a balloon sinuplasty, the

731    NBF Defendants also schedule a concurrent SMRT and septal swell body

732    reduction. To support the billing for these procedures, NBF non-medical

733    employees, under the direction of Borane and Ghanem and with Khanna's

734    knowledge and support, edit every patient's medical file to include the phrases

735    "prominent septal swell bodies" and "turbinates noted to be enlarged,"

736    regardless of whether the medical provider who examined the patient observed

737    those conditions. The NBF Defendants include these phrases in each patient's

738    medical record to falsely support their claims to the government programs that

739    all three procedures—sinuplasty, SMRT, and septal swell body reduction—were

740    medically necessary, regardless of the truth of those phrases or the patient's true

741    medical needs.

73.     Another way in which the NBF Defendants further their fraud scheme and conspiracy is via illegal unbundling, which is a method of billing fraud in which a provider bills a multi-step procedure as separate procedures, rather than as one coded procedure. By billing each step separately, providers obtain higher reimbursement rates than they would if they properly billed the multi-step procedure under a single code. Under the direction of Borane, Ghanem, and Khanna, the NBF Defendants train the PAs who work for all the NBF affiliates including the NBF Defendants always to diagnose patients at the highest level possible so that the patient visit can be billed under multiple codes. The written training materials provided to the PAs of all of the NBF Defendants instruct them to list at least two diagnoses per patient so that the visit can be billed as a "level three," which provides a higher payment than a level one or two visit, regardless of whether those diagnoses apply. The training materials also instruct PAs to use modifiers and two different diagnosis codes per patient to ensure that they will be paid for both an office visit and a procedure on the same date, rather than only for the procedure (as the billing codes anticipate).

74.     Another way in which the NBF Defendants further their fraud scheme and conspiracy is by having medical assistants perform maxillofacial CT scans of all patients soon after their arrival for their initial appointment, regardless of the patient's reason for coming to the clinic. Patients are told that the CT scans are free. A PA then shows the CT images to the patient and, regardless of what the images show, tells the patient that the scan establishes that

764  the patient needs a balloon-sinuplasty procedure. NBF executives, including

765  Borane, Ghanem, and Khanna encourage the PAs to "interpret" the CT scans in

766  this way to convince the patients to agree during their first office visit to book

767  the procedure, regardless of medical necessity or chief complaint.

768        75.      In most, if not all, states, performing CT scans is beyond a medical

769  assistant's scope of allowed duties. The NBF Defendants, Borane, and Ghanem

770  ignore these restrictions in order to save money and increase the profits from

771  their scheme. Most "medical assistants" hired by the NBF Defendants are not

772  certified or formally trained to perform CT scans. Under the direction of Borane

773  and Ghanem, and with Khanna's knowledge and support, the NBF Defendants

774  intentionally hire individuals who have no medical background to perform these

775  functions.

776        76.      To increase their profit from their fraud scheme via the use of non-

777  certified medical assistants to perform CT scans, the NBF Defendants, under the

778  direction of Borane and Ghanem, hide from state regulating bodies its use of

779  these medical assistants. When Arizona's Department of Health Services was

780  scheduled to do a walk-through audit of the CT equipment at NBF's Arizona

781  affiliates, NBF regional director Sierra Wuertz, a former restaurant manager and

782  wife of Borane's best friend, sent an email informing all personnel at those

783  clinics that DHS would "want to know who operates the CT scanners" and

784  instructing personnel to lie to DHS by saying that "the providers do."

785      77.    Borane's sister Brittany Camden, a former elementary school

786 special education teacher who is not a medical professional, sent emails to all

787 NBF affiliates, including the NBF Defendants, instructing the administrative

788 staff at those affiliates that patients should be scheduled for a repeat CT scan

789 whenever necessary to ensure that the patient would meet insurance criteria,

790 including that of the government programs. She told them, in other words, to

791 order a second CT scan, which would expose the patient to additional radiation,

792 even if, in the judgment of the patient's medical provider, no additional scan was

793 medically necessary, if that's what it would take to get the claim paid. Her

794 instructions reveal that NBF executives establish policies and procedures for all

795 of the NBF affiliates based solely on doing whatever is necessary to ensure

796 payment, regardless of the patient's best interests and need for treatment.

797      78.    The NBF Defendants also hide the fact that medical assistants

798 perform the CT scans from the government programs and from private insurers,

799 billing the scans under the name of the medical provider even though that

800 provider did not perform the scan. Both private insurance companies and

801 government programs frequently refuse to pay for these CT scans, even without

802 knowing that they were performed by an unlicensed medical assistant, because

803 the NBF Defendants do not seek or obtain preauthorization for the scans. The

804 NBF Defendants perform them anyway because the scan images are so powerful

805 in furtherance of their fraud scheme to persuade patients to have a balloon-

COMPLAINT                                             36

806    sinuplasty procedure and to obtain reimbursement, regardless of medical

807    necessity.

808    **D.    Specific Patient Examples**

809    79.    The scheme as described above was carried out in practice on

810    multiple patients whose records Relator has personally reviewed. Many of these

811    patients were covered by a government healthcare program, such as Medicaid,

812    Medicare, TRICARE, or Medicare Advantage. Although these patients were all

813    treated at Trinity ENT in Gilbert, Arizona, Borane, Ghanem, and Khanna

814    ensured that the employees of all of the NBF Defendants were trained to carry

815    out the same fraudulent practices and procedures with respect to disregarding

816    medical necessity, creating false medical records, and submitting claims for

817    payment from government programs based on those false records and false

818    certifications of medical necessity. These examples are only the tip of the iceberg

819    of the NBF Defendants' fraud.

820    80.    **Patient One**: N.A., a patient insured by TRICARE, visited Trinity

821    ENT on January 23, 2023, complaining that his tonsils had been bleeding and

822    requesting to be referred for a sleep study. PA Clifford Guss saw N.A. on that

823    day and referred him for the requested sleep study. Despite N.A. voicing no

824    complaints about his sinuses or breathing, Guss also performed a nasal

825    endoscopy and induced N.A. to agree at the visit to schedule a balloon

826    sinuplasty, as Guss had been trained to do. In conformance with the policy

827    implemented by Borane and Ghanem, Guss saved, but did not sign, his clinical

828   note that day as an "office visit." Software shows that the note was edited twice

829   the next day by a non-medical provider and then a "word merge print" was

830   performed to add the Z-Auth verbiage that the NBF Defendants use to falsely

831   suggest that a provider determined that a balloon sinuplasty was medically

832   necessary. Only after Guss's note had been falsified by non-clinical personnel

833   was the note "signed" for use in supporting a bill to TRICARE for the balloon-

834   sinuplasty procedure. On information and belief, Trinity ENT submitted, or

835   caused to be submitted, a claim for payment to TRICARE for N.A.'s balloon-

836   sinuplasty procedure, with the medical-necessity certification for those

837   procedures premised on the false documentation added to N.A.'s medical record.

838       81.    **Patient Two**: J.E., a patient covered by Medicaid, saw PA Laura

839   Hockenberger at Trinity ENT on January 12, 2023, complaining of ringing in

840   the ears (tinnitus) and vertigo. Despite that she did not complain of sinus

841   symptoms, she agreed to undergo an endoscopy and balloon sinuplasty. The

842   clinical note that Hockenberger created and saved (but did not sign and close)

843   was edited once that day and again on another occasion, both times by someone

844   other than Hockenberger. A template was added on January 19, 2023, which is

845   the date on which a claim was billed to Medicaid for her balloon-sinuplasty

846   procedure. Non-medical personnel edited Hockenberger's note to remove her

847   comment that J.E. should be referred for allergy testing at post-op and to falsify

848   the patient's primary complaint to include "difficulty breathing through nose."

849   As edited, the note used to establish medical necessity for J.E.'s balloon

850    sinuplasty says nonsensically both that J.E. had "constant dizziness" and that he

851    "denies dizziness."

852         82.    **Patient Three**: M.H., who is covered by TRICARE, was treated

853    by Hockenberger at Trinity ENT on February 22, 2023. M.H.'s primary

854    complaint at his appointment was a constant cough. As trained by NBF,

855    Hockenberger performed a nasal endoscopy and a laryngoscopy. M.H. agreed to

856    undergo a balloon sinuplasty in order to treat his cough. The clinical note that

857    Hockenberger prepared and saved (but did not sign and close) that day was

858    updated and edited repeatedly between February 22 and April 17, 2023,

859    removing Hockenberger's recommendation to refer M.H. to an allergist. In

860    addition, a Z-Auth stating that it had been prepared by Dr. Kumar was added on

861    April 17, 2023. In truth, non-medical personnel created the Z-Auth and falsely

862    added Dr. Kumar's signature. On information and belief, Trinity ENT submitted,

863    or caused to be submitted, a claim for payment to TRICARE for M.H.'s balloon-

864    sinuplasty procedure, with medical necessity for that procedure premised on the

865    false documentation added to M.H.'s medical record.

866         83.    **Patient Four**: On February 23, 2023, Hockenberger treated

867    patient T.M., who was covered by Medicaid, at Trinity ENT. That same day,

868    Hockenberger wrote and saved, but did not sign, a clinical note regarding the

869    visit, in accordance with NBF's established policies. Non-medical personnel

870    edited the note twice the next day and word merged it with a Z-Auth template

871    on February 27, 2023. Although T.M. had complained of throat pain and post-

872    nasal drainage, non-medical personnel edited Hockenberger's note to remove

873    mention of T.M.'s "history of recurring sinus infections." After an endoscopy,

874    T.M. agreed to have a balloon sinuplasty performed. On information and belief,

875    Trinity ENT submitted, or caused to be submitted, a claim for payment to

876    Medicaid for T.M.'s balloon-sinuplasty procedure, with medical necessity for

877    that procedure premised on the false documentation added to T.M.'s medical

878    record.

879            84.    **Patient Five**: L.P, who has Medicaid coverage, came to Trinity

880    ENT on April 3, 2023, complaining of a ruptured ear drum, ear pain, and hearing

881    loss and was seen by Relator. Relator entered and saved her clinical note

882    regarding the visit, but she did not sign it. On April 6 and 7, 2023, someone other

883    than Relator edited the note four times, and, on April 12, 2023, someone other

884    than Relator merged a Z-Auth template into the note, resulting in an inaccurate

885    and untrue narrative describing L.P.'s visit. Although the final note shows that

886    Relator signed it, she did not. In fact, Relator did not see the final version of the

887    note until months later. Ultimately, L.P. underwent a balloon-sinuplasty

888    procedure. On information and belief, Trinity ENT submitted, or caused to be

889    submitted, a claim for payment to Medicaid for L.P.'s balloon-sinuplasty

890    procedure, with medical necessity for that procedure premised on the false

891    documentation added to L.P.'s medical record and on Relator's forged signature

892    on the clinical note.

893
894
895
896
897
898
899
900
901
902
903
904
905
906
907
908
909
910
911
912
913
914

85.    **Patient Six**: R.S. is a Medicaid patient whom Relator saw on April 28, 2023, at Trinity ENT and who ultimately underwent a balloon sinuplasty. At NBF clinics, each patient is asked to complete a Sino-Nasal Outcome Test (or "SNOT"), on which they report relevant symptoms and the relative severity of each. A comparison of R.S.'s answers on the SNOT test to the information recorded by the clinic as to her symptoms and background is striking. For example, on a scale of zero to five, with zero being non-existent and five being the most severe, R.S. stated that her post-nasal discharge was a zero. Yet the final note for R.S., which was edited at least six times between April 28 and June 2, 2023, says that R.S. had a "chief complaint of posterior mucopurulent nasal drainage" – also known as post-nasal discharge (not allowed to write post nasal discharge due to autocorrect in EMR preventing regular post nasal discharge be used). Multiple comments about such discharge were added by merging a Z-Auth template authored by non-medical personnel, who also added the forged signature of Dr. Vats, into the clinical notes. Moreover, the SNOT test summary prepared by NBF claimed that R.S. reported post-nasal discharge even though she did not do so. Finally, despite that R.S. stated on an intake form that she had not used antibiotics within the past year, her medical record was falsified to state that she had taken one full course of Augmentin. Relator has reviewed the "signed" note for this patient and confirms that she neither made nor approved the edits to her original note and that she did not sign the final version. On information and belief, Trinity ENT submitted, or caused to be submitted, a

915    claim for payment to Medicaid for R.S.'s balloon-sinuplasty procedure, with

916    medical necessity for that procedure premised on the false documentation added

917    to R.S.'s medical record.

918        86.   **Patient Seven**: M.S., who is covered by Medicaid, was treated by

919    Hockenberger on January 23, 2023, at Trinity ENT. M.S.'s chief complaint was

920    ear pain, and Hockenberger removed impacted cerumen (earwax). But M.S. also

921    underwent a "free" CT scan, after which Hockenberger told M.S. that her CT

922    and endoscopy revealed sinus disease. M.S. agreed to undergo a balloon

923    sinuplasty. After Hockenberger had created the original clinical note on January

924    23, 2023, non-medical personnel applied templates and edited Hockenberger's

925    note before the note was completed and "signed" with Hockenberger's forged

926    signature on February 10, 2023. On information and belief, Trinity ENT

927    submitted, or caused to be submitted, a claim for payment to Medicaid for M.S.'s

928    balloon-sinuplasty procedure, with medical necessity for that procedure

929    premised on the false documentation added to M.S.'s medical record.

930        87.   **Patient Eight**: M.W., a patient who had Medicaid coverage,

931    visited Trinity ENT on April 18, 2023, and was seen by Relator, who created a

932    clinical note that she saved, but did not sign and close, on that same date. M.W.'s

933    intake forms show that M.W. had not taken any antibiotics within the preceding

934    year. The day after the visit, a non-medical provider made six changes to

935    Relator's note without Relator's knowledge, with the note being changed to

936    report that M.W. had taken a round of Amoxicillin in the previous year.

937   Additionally, Z-Auths were uploaded to M.W.'s record and to Relator's
938   treatment notes on March 13, May 16, and May 23, 2023. The final note falsely
939   shows that Relator signed it. On information and belief, Trinity ENT submitted,
940   or caused to be submitted, a claim for payment to Medicaid for M.W.'s balloon-
941   sinuplasty procedure, with medical necessity for that procedure premised on the
942   false documentation added to M.W.'s medical record.

943   88.   **Patient Nine**: T.T. also had Medicaid coverage. Hockenberger
944   saw her at Trinity ENT on January 18, 2023, and created and saved, but did not
945   sign and close, a clinical note stating: "No history of vertigo, dizziness, or
946   imbalance. No history of sinus pain pressure or congestion. Denies ear pain.
947   Unable to auto insufflate ears. Denies mouth breathing/waking up with a dry
948   mouth, snoring. Denies posterior mucopurulent drainage. Denies nasal
949   congestion, some dried mucus. States breathing through nose okay." Through
950   the course of at least six edits to Hockenberger's note by non-medical personnel,
951   all of that information was removed from the note. T.T. agreed to undergo a
952   bilateral balloon sinuplasty and turbinate reduction, and, on information and
953   belief, Trinity ENT submitted, or caused to be submitted, a claim for payment
954   to Medicaid for T.T.'s balloon-sinuplasty procedure, with medical necessity for
955   that procedure premised on the false documentation in T.T.'s medical record.

956   89.   **Patient Ten**: R.K., a Medicare Advantage patient, visited Trinity
957   ENT on November 15, 2022, and was seen by Guss for a primary complaint of
958   vertigo, dizziness, and headaches. Guss's clinical note stated that R.K. denied

959    having any facial pain, pressure, or nasal obstruction. Yet R.K. underwent an

960    endoscopy, after which he was told that he had sinus disease, and he agreed to

961    undergo a bilateral balloon sinuplasty. Following his initial visit, Guss's clinical

962    note was edited at least five times, with three of those edits being by a non-

963    medical provider. The repeated editing resulted in the "signed" note falsely

964    identifying sinus pressure as R.K.'s "chief complaint" and, while still providing

965    that R.K. had denied sinus symptoms, the note contradicted itself by also saying

966    falsely that the patient reported facial pain and pressure. Most importantly,

967    although Guss's original noted said in all capital letters that R.K. should have

968    "NO NARCOTICS OR VALIUM," this statement was removed from the

969    clinical note during editing, and the final, "signed" note includes NBF's standard

970    statement that prescription pain medicine will be sent to the patient's pharmacy

971    for post-op medication. On information and belief, Trinity ENT submitted, or

972    caused to be submitted, a claim for payment to Medicare Advantage for R.K.'s

973    balloon-sinuplasty procedure, with medical necessity for that procedure

974    premised on the false documentation added to R.K.'s medical record.

975    **E.    Relator's Knowledge of the Fraudulent Scheme**

976        90.    Relator Michelle Nemeh is a former employee and therefore an

977    insider as to the NBF Defendants. Realtor Nemeh, a PA, was hired by Defendant

978    NBF in August 2021. She attended NBF's annual conference in Las Vegas from

979    August 25 to 28 of that year, which included instruction from a life coach on

980    how to persuade patients of different personalities to undergo balloon sinuplasty.

981    She also attended NBF training for PAs in Washington, D.C., from August 29

982    to September 10, 2021. This training was conducted by Lauren Wills, who is

983    NBF's Director of Clinical Development and

984         91.    Relator initially worked at Scottsdale Sinus and Allergy, where

985    two PAs who were also working there shared her concern about the impropriety

986    of NBF's instruction to them not to sign their own clinical notes and NBF's

987    policy to disregard the use of conservative treatment measures and to disregard

988    the judgment of its medical providers. The other PAs told Relator that they had

989    repeatedly expressed concerns about these things but had been told that signing

990    their own notes was absolutely not a possibility. One of the two PAs was later

991    terminated and portrayed as "difficult," leaving Relator worried for her

992    employment should she become viewed as a troublemaker or raise too many

993    questions about her clinical notes or the patients' treatment.

994         92.    As part of her employment with NBF at Scottsdale Sinus and

995    Allergy and later at Trinity Ear Nose and Throat, Relator had access to clinical

996    notes; training material applicable to all NBF Defendants; emails, some of which

997    were sent to PAs at all NBF Defendants; and some billing information. Relator

998    is familiar with, and has personal knowledge of, Defendants' ordinary business

999    patterns and practices with respect to persuading patients to book balloon-

1000    sinuplasty procedures, changing clinical notes, calling in "procedural"

1001    antibiotics, and the other practices detailed herein.

93.    NBF administration became frustrated with Relator for having a higher rate of cancellations than other providers. This cancellation rate was because Relator would tell her patients to take the antibiotics that were prescribed and to cancel the scheduled procedure if their symptoms resolved, contrary to NBF's instructions to prescribe such antibiotics but to tell the patients not to take them. Relator's concerns about NBF's practices, including the fact that she was not allowed to sign her own clinical notes, led to her resignation in 2023. During her employment with NBF, Relator discovered that non-medical personnel had been editing and changing her clinical notes without her authorization before NBF had billed her patients' visits to insurance companies, including government programs.

94.    For example, Relator treated patient M.C. on February 27, 2023, at Trinity ENT, and Relator created her clinical note at that time. NBF's electronic medical record M.C. shows that the note was edited by non-medical personnel on March 1 and again on March 21, 2023. The contraindications tab shows that the edits removed Relator's notes referring M.C. for a more comprehensive C.T. scan and listing a possible diagnosis of polyps, which would have made M.C. a poor candidate for a balloon sinuplasty.

95.    Similarly, Relator saw Medicare Advantage patient S.B. on March 31, 2023, at Trinity ENT. On April 3, 2023, S.B.'s electronic medical chart was edited five times, with those edits removing Relator's notation that the patient had not recently undergone antibiotic treatment. Given that the NBF Defendants

1024  edit patient notes only to suggest medical necessity for balloon sinuplasty, on

1025  information and belief, S.B. did undergo that procedure, and Trinity ENT billed

1026  Medicare Advantage for it, with medical necessity for the procedure premised

1027  on the falsified medical record.

1028  96.    Another patient treated by Relator at Trinity ENT, S.M., had

1029  insurance coverage through Medicare Advantage, which would not authorize

1030  balloon sinuplasty until S.M. had been treated with antibiotics and had

1031  undergone a second endoscopy procedure and a second CT. But S.M.'s medical

1032  record showed that she underwent only one of each procedure, without returning

1033  for the required second round. Yet someone at NBF created a fraudulent

1034  "progress note" in her medical record to make it seem as if she had met the

1035  prerequisite requirements, even though she had not. Given that the NBF

1036  Defendants edit patient notes only to suggest medical necessity for balloon

1037  sinuplasty, on information and belief, S.M. did undergo that procedure, and

1038  Trinity ENT billed Medicare Advantage for it, with medical necessity for the

1039  procedure premised on the falsified medical record.

1040  97.    Relator has personal knowledge of, and experience with, many

1041  other examples of falsified patient records, as well as Defendants' practice of

1042  pushing balloon-sinuplasty procedures on patients who did not complain of sinus

1043  problems, performing CT scans on each patient, using that scan to convince the

1044  patient to schedule a balloon-sinuplasty procedure prior to leaving the office

1045  after their first appointment, prescribing antibiotics that patients were instructed

1046    not to use, and editing and falsifying clinical notes. For example, Relator knows

1047    of a patient, D.J., who went to Oasis Ear, Nose, and Throat for a consultation,

1048    complaining of muffled hearing, dizziness, and vomiting. When the Oasis PA

1049    who saw her pushed her to agree to undergo a balloon sinuplasty even though

1050    she had told the provider repeatedly that she had no sinus symptoms, she left

1051    without scheduling the procedure. The patient later called and asked for a second

1052    opinion from an Oasis physician and was told that would not be possible.

1053    Ultimately, she declined to undergo the procedure and went to another ENT

1054    clinic. There, she underwent an MRI of her brain and was diagnosed with

1055    Menier's disease, a diagnosis for which balloon sinuplasty would not have been

1056    an appropriate treatment.

1057        98.    Relator now brings this action on behalf of the United States of

1058    America to recover part of the damages caused by Defendants' widespread fraud

1059    against government healthcare programs.

1060                    **V.    CAUSES OF ACTION**

1061                         **COUNT I**

1062    **FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS**

1063        99.    The preceding paragraphs are incorporated.

1064        100.    Relator brings this civil action on behalf of the United States of

1065    America against Defendants under the False Claims Act, 31 U.S.C. §§ 3729-33.

1066        101.    During the relevant period, Defendants and their affiliates, agents,

1067    and employees, at Defendants' direction, knowingly presented or caused to be

presented numerous materially false or fraudulent claims for payment to the United States, through the government programs, for balloon sinuplasties, nasal stents, CT scans, and other medical services, in violation of 31 U.S.C. § 3729(a)(1)(A).

102.    Defendants had actual knowledge of the falsity of these claims or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

103.    The United States suffered damages because of the false claims that Defendants made, used, and caused to be made and used, and is entitled to recover its losses and obtain other relief available under the FCA.

## COUNT II

### FALSE CLAIMS ACT – PRESENTATION OF FALSE RECORDS AND STATEMENTS

104.    The preceding paragraphs are incorporated.

105.    During the relevant period, Defendants and their affiliates, agents, and employees, at Defendants' direction, knowingly made, used, or caused to be made or used materially false or fraudulent records or statements material to false or fraudulent claims to the United States, through the government programs, for balloon sinuplasties, nasal stents, CT scans, and other medical services, in violation of 31 U.S.C. § 3729(a)(1)(B).

106.    Defendants had actual knowledge of the falsity of these records and statements or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

107.    The United States suffered damages because of the false records and statements that Defendants made, used, and caused to be made and used, and is entitled to recover its losses and obtain other relief available under the FCA.

## COUNT III

### CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT
### 31 U.S.C § 3729(a)(1)(C)

108.    The preceding paragraphs are incorporated.

109.    During the relevant period, as described above, the Defendants conspired to (1) present and cause to be presented false or fraudulent claims for payment or approval to the government programs in violation of the FCA, and (2) make, use, or cause to make or use, false records or statements material to false or fraudulent claims presented to the United States through the government programs in violation of the FCA.

110.    In furtherance of the conspiracy, Taylor, Borane, Ghanem, and employees at the NBF Defendants under their direction and supervision committed numerous overt acts described above, including editing and falsifying clinical notes to reflect symptoms not observed or to remove symptoms that were observed, or directing or permitting others to do so; affixing forged signatures

to clinical notes, or directing or permitting others to do so; submitting or causing

the submission of claims to Medicare, Medicaid, and TRICARE supported by

those falsified records; and training or causing the training of PAs and other staff

members at all the NBF Defendants to create and use false records for billing

purposes.

111.    For the reasons alleged herein, Defendants knew that the claims

and records were false and fraudulent within the meaning of the FCA or acted

with deliberate ignorance to or reckless disregard of the truth, intending to

induce the government programs to pay claims based on falsified material

information and documentation, in violation of 31 U.S.C. § 3729(a)(1)(C).

112.    The United States suffered damages as a result of the false

records and statements made by Defendants and is entitled to recover its losses

and obtain other relief available under the FCA.

## VI.    JURY DEMAND

113.    Relator respectfully demands a trial by jury.

## VII.    PRAYER

114.    Relator respectfully requests the following relief:

(a)    That Defendants be ordered to cease and desist in submitting
or causing to be submitted any false or fraudulent claims to the
government programs, or in conspiring to do so;

(b)    That Defendants be ordered to cease and desist in making,
using, and causing to be made and used, false records and

1132                        statements material to false and fraudulent claims to the

1133                        government programs, or in conspiring to do so;

1134          (c)       That judgment be entered in favor of the United States and

1135                        Relator and against Defendants in the amount of each and

1136                        every false or fraudulent claim, multiplied by three as provided

1137                        by 31 U.S.C. § 3729(a), plus a civil fine for each and every

1138                        such claim in the amount of between  $14,308 to $28,619 per

1139                        claim;

1140          (d)       That Relator be awarded the maximum amount permissible

1141                        under 31 U.S.C. § 3730(d); and

1142          (e)       All such other and further relief, at law or in equity, to which

1143                        the United States and Relator show themselves to be justly

1144                        entitled.

1145 DATED:  October 27, 2025                Respectfully submitted,
1146
1147 */s/ Alina Veneziano*                       */s/ Linda Julin McNamara*
1148 Alina Veneziano                              Linda Julin McNamara
1149 Arizona Bar Number 039347            Admitted *Pro Hac Vice*
1150 Oberheiden P.C.                             Florida Bar Number 0714887
1151 13155 Noel Road, Suite 900           Oberheiden P.C.
1152 Dallas, TX  75240                          13155 Noel Road, Suite 900
1153 Alina@federal-lawyer.com             Dallas, TX  75240
1154                                         Linda@federal-lawyer.com
1155
1156
1157 **Attorneys for Relator Michelle Nemeh**
1158

1159
1160
1161

1162

1163
1164
1165

1166
1167

**Certificate of Service**

I hereby certify that on October 27, 2025, this document was served on

all parties of record via CM/ECF filing.

/s/ _Linda Julin McNamara_
Linda Julin McNamara