Alina Veneziano
Arizona Bar Number 039347
Linda Julin McNamara (Admitted *Pro Hac Vice*)
Florida Bar Number 0714887
Oberheiden P.C.
13155 Noel Road, Suite 900
Dallas, TX  75240
Alina@federal-lawyer.com
Linda@federal-lawyer.com

*Attorneys for Relator Michelle Nemeh*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

United States of America,
*ex rel.* Michelle Nemeh,

      Plaintiff and Relator,

vs.

National Breathe Free Sinus &
Allergy Centers, LLC, et al,

      Defendants.
_____/

No. Cv23-02009-Phx-JFM

**MICHELLE NEMEH'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

      Relator Michelle Nemeh ("Relator" or "Nemeh") respectfully responds as follows in Opposition to Defendants' Motion to Dismiss the First Amended Complaint (the "Complaint," ECF 38).  The Defendants' Motion is premised on a fundamental misreading of the Complaint's well-pleaded allegations and therefore must be denied.

## I.    Introduction

This action arises from a nationwide scheme orchestrated by National Breathe Free Sinus & Allergy Centers, LLC ("NBF") and its executives Manish Khanna, M.D., Nabiel Matthew Ghanem, and Taylor Borane, perpetrated through the affiliated entities named in the Complaint (described collectively as the "NBF Defendants"), to defraud federal healthcare programs in violation of the False Claims Act, 31 U.S.C. § 3729 (the "FCA"). The Complaint alleges with particularity that the NBF executives and the NBF Defendants submit and cause the submission of claims for balloon-sinuplasty procedures that are not based on medical necessity but are based on a desire for profits, with those claims being supported by fabricated and fraudulently signed medical notes and records. As the Complaint contends in its detailed factual allegations, NBF and its executives systematically pressure its healthcare providers to order unnecessary procedures, they falsify medical records without provider knowledge, and they cause the submission of false claims to Medicare, Medicaid, TRICARE, and Medicare Advantage. These allegations satisfy the Ninth Circuit's standards for pleading falsity, materiality, causation, scienter, and conspiracy under the FCA, and meet the heightened pleading requirements of Fed. R. Civ. P. 9(b).

Moreover, the Court has personal jurisdiction over all Defendants, including those entities organized, operating, or residing outside the State of Arizona. Because 31 U.S.C. § 3732(a) authorizes national service of process,

this Court can exercise personal jurisdiction over any defendant that has minimum contacts with the United States, which all Defendants do here.

And finally, Defendants' constitutional challenges to the qui tam provisions lack merit and are contrary to binding precedent.

For these reasons, and as detailed below, the Complaint states viable claims, and the Defendants' motion to dismiss should be denied in its entirety.

## II.    Argument

### A.    Legal Standard

The FCA makes liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(A)-(B). Therefore, to survive a motion to dismiss, an FCA complaint must allege four essential elements: "(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing, (4) the government to pay out money or forfeit moneys due." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc*., 953 F.3d 1108, 1114 (9th Cir. 2020) (quoted citation omitted).

The Complaint in this case alleges that the Defendants knowingly presented or caused to be presented numerous materially false or fraudulent claims for payment to the United States through government healthcare programs (Medicare, Medicaid, TRICARE, and Medicare Advantage) for balloon sinuplasties, nasal stents, CT scans, and other medical services. ECF 32

at ¶¶ 45–66. The Complaint further alleges that the Defendants conspired to violate the FCA, by creating and presenting false records or statements with the intent to induce government programs to pay such claims based on the falsified information and documentation presented. *Id*. at ¶¶ 53–66.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint's factual allegations, taken as true and drawing all inferences in favor of the Relator, simply must state a "plausible claim for relief." *See Winter,* 953 F.3d at 1116, 1119. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoted citation omitted).

Although Fed. R. Civ. P. 9(b) requires FCA claims to be pleaded with particularity, the relator need only "provide enough detail 'to give [defendants] notice of the particular misconduct which is alleged to constitute the fraud charged so that [they] can defend against the charge and not just deny that [they have] done anything wrong.'" *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 999 (9th Cir. 2010) (quoting *United States ex rel. Lee v. SmithKline Beecham, Inc*., 245 F.3d 1048, 1051-52 (9th Cir. 2001)). The "complaint must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *United States ex rel. Relator, Ltd. Liab. Co. v. Ilink Emp'rs*

*Co*., No. 24-5636, 2025 U.S. App. LEXIS 28688, at *2 (9th Cir. Nov. 3, 2025) (internal quotation marks and quoted citation omitted).

Ms. Nemeh's Complaint easily meets that standard.

**B.     The Complaint Alleges Falsity**

"Because medical necessity is a condition of payment, every Medicare claim includes an express or implied certification that treatment was medically necessary. Claims for unnecessary treatment are false claims." *Winter*, 953 F.3d at 1114.

Therefore, a false certification of medical necessity submitted to a government healthcare program can give rise to FCA liability. *Winter*, 953 F.3d at 1113. A certification of this type can be "false" "for the same reasons any opinion can be false or fraudulent. These reasons include if the opinion is not honestly held, **or if it implies the existence of facts … that do not exist**." *Id*. at 1119 (emphasis added). And "a false certification of medical necessity can be material because medical necessity is a statutory prerequisite to Medicare reimbursement." *Id.*

Here, the Complaint specifically alleges that, under the training and direction of Ghanem, Borane, and Khanna, the NBF Defendants "falsely certify[] or caus[e] the submission of false certifications on claims for payment to the government programs" that patient services for balloon-sinuplasty procedures "were medically indicated and necessary for the health of the patients." ECF 32 at ¶ 5. It explains that the claims the Defendants submitted to

government healthcare programs for those procedures (1) could not have been based on any honestly held determination of medical necessity by any healthcare provider because, even before the patients had been seen by any provider, the Defendants had predetermined to order the procedures, and (2) were based on express or implied certifications of medical necessity that were backed by falsified patient medical records—in other words, that implied the existence of facts that did not exist. *See* ECF 32 at ¶¶ 48, 51–64. Explaining the scheme, the Complaint alleges:

> [U]nder the direction of Ghanem, Borane, and Khanna, and in furtherance of their conspiracy and scheme to defraud the government programs, the NBF Defendants' systemic policy and practice is to convince as many patients as possible at every NBF Defendant facility to undergo a balloon-sinuplasty procedure **without any consideration of medical necessity**; **to have non-medical personnel alter patients' medical records to bolster the ordering of that procedure even when doing so requires the inclusion of false information**; and to fraudulently bill—or cause to be billed—a government program for the procedure in violation of the FCA without regard to either medical necessity or the fact that the underlying documentation has been falsified to support the claim that the procedure was medically indicated and necessary for the health of the patient.

ECF 32 at ¶ 44.

The Complaint goes on to include specific allegations as to how the Defendants' scheme works, explaining that, "With no concern for medical necessity, Borane, Ghanem, Khanna, directly and through other NBF managers and administrators, instruct PAs and other medical providers that they should schedule a balloon sinuplasty during the first appointment for at least 80% of all

patients whose primary complaint is sinus related and for at least 50% of all patients whose primary complaint is not sinus related," and that the executives penalize the providers who fail to follow this directive while handsomely rewarding providers who do. ECF 32 at ¶ 52.

The Complaint alleges further that, to support the claims submitted to the federal programs, the executives also have created and regularly execute a system for falsifying patients' medical records, prohibiting the providers who actually examine the patients from signing their own medical notes and having non-medical personnel revise and falsify those notes in various ways. ECF 32 at ¶ 54; *see also id. at* ¶¶ 52–62. The Complaint alleges that, in this way, "the NBF Defendants, under the direction of Ghanem, Borane, and Khanna, purposefully cause the creation of false documentation at all NBF affiliates, including the NBF Defendants, purporting to show that a healthcare provider determined, based on an actual medical assessment, that a balloon sinuplasty was medically necessary, even though, pursuant to the NBF Defendants and Borane's, Khanna's, and Ghanem's conspiratorial agreement and scheme with the NBF Defendants, the patient was destined to undergo the procedure the moment he or she scheduled an appointment at the NBF clinic, long before any medical assessment occurred." ECF 32 at ¶ 55. The Complaint explains that, ultimately, the forged signature of a medical provider is affixed to the falsified medical records, which were created not to document the patient's actual symptoms but instead to create the illusion that the provider determined medical necessity

based on the patient's history and symptoms, rather than on the Defendants' desire to profit. ECF 32 at ¶ 59.

The Complaint then includes actual examples of occasions on which the Defendants executed this scheme—examples showing actual patients who came to one of the NBF clinics complaining of symptoms unrelated to their sinuses, whose patient records were edited and falsified by non-medical personnel to create the false impression that a medical provider had ordered balloon sinuplasty based on an honestly held determination of medical necessity, and who had ultimately had undergone a balloon sinuplasty procedure. *See* ECF 32 at ¶¶ 80–89. These examples show specific instances in which the NBF executives, through the NBF Defendants, caused healthcare providers and non-medical personnel to execute their scheme to dupe a federal healthcare program into believing that a provider had objectively and honestly determined medical necessity, although in fact the NBF providers, at the direction of the NBF executives, start with the premise that the patient will undergo balloon sinuplasty and then NBF non-medical personnel manufacture symptoms and medical history that actually do not exist to induce the pertinent federal healthcare program to pay. In these instances and many, many others, any implied or express certification of medical necessity was based on the existence of facts that simply do not exist. *Winter* establishes that these claims were false. *Winter*, 953 F.3d at 1119 (an opinion of medical necessity is false if it implies the existence of facts that do not exist).

The Defendants' contention that Ms. Nemeh fails to allege "how physicians determined whether balloon sinuplasty procedures were appropriate from case to case, what factors they considered, or what information was available to them in the decision-making process," ECF 38 at 15, ignores the very foundation of the Complaint—namely, that the NBF executives trained and required their Physician Assistants, who were the primary healthcare providers examining and interacting with the patients, to begin every patient interaction with the premise that the patient would undergo a balloon sinuplasty procedure and to book the procedure before the patient leaves their first office visit "*without any determination of medical necessity.*" *See* ECF 32 at ¶¶ 48, 64 (emphasis added). According to the Complaint, "The[] executives and managers, including Ghanem, Borane, and Khanna, either directly or through others, train the PAs that these procedures are appropriate regardless of the patient's underlying complaint or diagnosis; in other words, **regardless of medical necessity**." ECF 32 at ¶ 51 (emphasis added). The Complaint explains that non-medical personnel then falsify the patient records to create the illusion that the PA actually determined medical-necessity by examining the patient, memorializing the patient's actual medical history and symptoms, and taking those into account when deciding that the procedure was necessary and appropriate for the treatment of illness. ECF 32 at ¶¶ 53–64. In other words, the NBF Defendants induce—indeed require—their healthcare providers to presume they will order these procedures before the providers have even considered medical necessity

for their patients, and non-medical personnel at the NBF Defendants then falsify the patient records to make it appear falsely that a medical-necessity determination drove the provider's decision. The Complaint's allegations that the NBF Defendants submit claims for the procedures under these fraudulent circumstances surely meet the pleading requirement as to falsity.

This is true regardless of the fact that there is no National or Local Coverage Determination as to balloon sinuplasty. As the Complaint alleges, "coverage under all government programs is subject to standard medical-necessity guidelines and is dependent upon quality supporting clinical notes and sufficient documentation." ECF 32 at ¶ 47. CMS "pay[s] for services when the medical record documentation supports Medicare coverage, coding, and billing requirements." ECF 32 at ¶¶ 32, 47. Therefore, when a healthcare provider fails to form an honestly held opinion as to medical necessity before deciding to order a service and the medical facility billing for her services falsifies patient records to make it appear that she did, the submission of claims for those services surely are false.

## C. The Complaint Alleges Materiality

Because "[t]he medical necessity requirement is not an 'insignificant regulatory or contractual violation,'" "a false certification of medical necessity can be material." *Winter,* 953 F.3d at (quoting *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 196 (2016)).

Again ignoring the Complaint's allegations that the NBF Defendants submit claims for payment *without any underlying true and honest determination of medical necessity and premised on falsified patient records and provider signatures*, the Defendants contend that the Complaint fails to sufficiently allege materiality because no statute, regulation, guidance, or medical standard sets out the medical-necessity perquisites for balloon sinuplasty procedures. *See* ECF 38 at 13. They suggest, in other words, that, in the absence of formal guidance for the determination of medical necessity as to a particular course of treatment, a healthcare provider can wholly ignore her obligation to determine medical necessity, make up symptoms and patient history, and then bill CMS for that treatment as if the provider pursued the treatment based on an honestly held opinion of medical necessity. Nothing they cite supports that absurdity.

Here, the Complaint alleges, "If the pertinent government program had known that the provider ordering the balloon sinuplasty had not independently determined medical necessity before deciding whether to order the procedure, or had known that the documentation underlying the claim supposedly establishing medical necessity was materially false, that program would not have paid for those claims." ECF 32 at ¶ 64; *see also id*. at ¶ 65. The Complaint alleges in other words that Defendants' false certifications of medical necessity and fraudulent medical records were so central to the government healthcare programs that those programs "would not have paid these claims" if it had

known that no medical-necessity determination had been made and that the patients' medical records had been falsified. *Winter* establishes that the Complaint has sufficiently pleaded materiality at this stage of the case. *See Winter*, 953 F.3d at 1122 (citing *United States ex rel. Campie v. Gilead Scis*., 862 F.3d 890, 907 (9th Cir. 2017)).

### D. The Complaint Alleges Causation

"The causation element under 31 U.S.C. § 3729 is satisfied if a person 'presents, or causes to be presented,' a false or fraudulent claim to the United States for payment or approval." *United States v. Mackby*, 261 F.3d 821, 829 (9th Cir. 2001) (quoting 31 U.S.C. § 3729(a)(1) (1994)). "[A] relator is not required to identify actual examples of submitted false claims; instead, it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Godecke ex rel. United States v. Kinetic Concepts, Inc*., 937 F.3d 1201, 1209 (9th Cir. 2019) (internal quotation marks and quoted citations omitted). To satisfy Rule 9(b) pleading standards, the plaintiff must allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

As set forth above, the Complaint here indeed alleges "particular details of a scheme to submit false claims." It alleges, among other things, that "[o]nce a patient's clinical note has been edited and falsified sufficiently to support

coverage by the patient's government or private insurer, a non-medical NBF employee affixes the electronic signature of an NBF physician or PA to the note to use as support for the claim for payment submitted to the pertinent government or private insurance program," ECF 32 at ¶ 59; that the NBF Defendants do not afford their PAs any opportunity to review their edited and falsified clinical notes "before the claims for services backed by those notes are submitted to federal payors for reimbursement," *id.* at ¶ 60; and, that "the pertinent NBF Defendant submits or causes the submission of a claim for payment to the pertinent government program for the patient's balloon-sinuplasty procedure, with each claim including an express certification that the procedure was medically indicated and necessary for the health of the patient and an implied certification that the true and accurate medical documentation underlying the claim supports coverage," *id.* at ¶ 64. It also alleges that, if the government programs had known that the medical-necessity certifications were false and were backed by falsified medical records, those programs would not have paid the NBF Defendants' claims. *See, e.g.,* ECF 32 at ¶¶ 64, 65.

These allegations sufficiently allege causation.

### E.    The Complaint Alleges Scienter

"The FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023). The focus is "on what the defendant knew when presenting the

claim." *Id*. at 752. "[U]nder Rule 9(b), scienter need not be pleaded with particularity, but may be alleged generally." *Winter,* 953 F.3d at 1122 (citing Fed. R. Civ. P. 9(b)). "A complaint needs only to allege facts supporting a plausible inference of scienter." *United States ex rel. Lee v. Corinthian Colls*., 655 F.3d 984, 997 (9th Cir. 2011).

Under the FCA the term "knowingly" is broad and does not require proof of specific intent to defraud. Therefore, a defendant acts with the required scienter if he acts either with actual knowledge of the falsity of a claim or in deliberate ignorance or reckless disregard of falsity. *Winter*, 953 F.3d at 1114. This ensures that individuals or entities cannot escape liability by claiming they were unaware of the falsity of the information but acted recklessly or deliberately ignored the truth.

Given that, as described above, the Complaint here details a business practice that is premised on purposeful fraud—that is, the systematic ordering of costly medical procedures regardless of medical necessity and backed by purposely falsified patient records containing untrue information and forged provider signatures—the Complaint surely meets that requirement. The Complaint specifically alleges that the NBF executives "knowingly devised and implement the fraudulent practices and policies that are described in th[e] Complaint and that the NBF Defendants knowingly support and carry out." ECF 32 at ¶ 2. It describes in detail the "unlawful agreement and scheme to violate the FCA," contends that the NBF executives oversee the operations at all the

NBF Defendants and "require them to conform with and participate in NBF's fraudulent practices" or face termination, and alleges that "[a]ll of the NBF Defendants do so with knowledge and intent to violate the FCA." ECF 32 at ¶ 48.

With the Complaint setting forth facts showing that the basic structure and operation of all of the NBF Defendants was based and implemented on purposeful fraud, the Complaint sufficiently raises a reasonable inference that the NBF executives and the NBF affiliates know that that they have been submitting false claims. These allegations satisfy the scienter requirement. *See United States of Am. ex rel. Relator LLC v. Umansky*, No. 2:23-cv-05625-SB-PD, 2025 U.S. Dist. LEXIS 8204, at *9 (C.D. Cal. Jan. 14, 2025) (finding "the allegations about the basic structure and status of Holdco allow for a reasonable inference that Holdco knew it was not doing business and falsely certified that it was 'in operation.'").

## F.  The Complaint Meets Rule 9(b)'s Particularity Requirement

As the Defendants contend, Rule 9(b) "requires a party to 'state with particularity the circumstances constituting fraud or mistake,' including 'the who, what, when, where, and how of the misconduct charged.'" *Ebeid*, 616 F.3d at 998. "[I]t is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id*. (quoted citation omitted). The "allegations of fraud must be specific enough to give defendants notice of the particular misconduct

which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quotation marks and quoted citation omitted).

In the conspiracy context (as in this case), "there is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant." *Id*. "[A] plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[] in the alleged fraudulent scheme.'" *Id*. at 765 (quoting *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

Here, as discussed above, the Complaint alleges exactly how the fraud scheme works and the role of each named defendant. The Complaint alleges that the individual defendants—Khanna, Ghanem, and Borane—devised the scheme to bill federal programs for balloon-sinuplasty procedures regardless of medical necessity and to back those claims with fraudulent medical records; that they oversaw and implemented the training of NBF healthcare providers and non-medical personnel at all NBF-affiliated clinics, requiring them to conform with and participate in NBF's fraudulent practices; and that "[a]ll of the NBF Defendants do so with knowledge and intent to violate the FCA." ECF 32 at ¶ 48. The Complaint explains that all PAs hired to work at any NBF affiliate are required to undergo the same training under the direction of NBF's Director of Clinical Development and that, during this training and afterward, the PAs "are

instructed that all patients they see should book a balloon-sinuplasty procedure during their first visit," with the goal being "to book them before they leave the office." ECF 32 at ¶¶ 49–51. The NBF Defendants then incentivize all PAs throughout the system to book balloon-sinuplasty procedures without regard to medical necessity and reward those who do. ECF 32 at ¶ 52.

That the scheme is knowingly carried out through all the affiliated entities can be strongly inferred from the fact that all PAs throughout the system participate in the same training, and, as alleged in the Complaint, three PAs from Capitol Breathe Free Sinus and Allergy Centers were rewarded with Rolex watches at system-wide conferences in Scottsdale, Arizona, and Las Vegas, Nevada. ECF 32 at ¶ 52. In addition, the fact that "[a]dministrators and providers receive monetary bonuses generally once a month if bookings remain high" supports the inference that the same scheme is being implemented throughout the NBF system. *See id.*

The Complaint alleges further that the policy of fraudulently editing and signing medical records is carried out at all of the NBF Defendants and that all of them "submit or cause the submission of [false] certifications without any determination of medical necessity, regardless of medical necessity, and based on falsified underlying medical documentation." *See* ECF 32 at ¶¶ 53–64 (quotation at ¶ 64). And it alleges that "the pertinent NBF Defendant submits or causes the submission of a claim for payment to the pertinent government program for the patient's balloon-sinuplasty procedure, with each claim

including an express certification that the procedure was medically indicated and necessary for the health of the patient and an implied certification that the true and accurate medical documentation underlying the claim supports coverage." *Id*. at ¶ 64.

Although "Rule 9(b) does not allow a complaint to merely lump multiple defendants together, *Swartz*, 476 F.3d at 764, "[t]here is no flaw in a pleading … where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *See United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016). That is exactly what the Complaint does here.

Furthermore, the Complaint is not akin to the complaint in *United States ex rel. Armstrong-Young v. Carelink Hospice Servs., Inc.*, No. 15-cv-04095, 2018 U.S. Dist. LEXIS 170334 (N.D. Cal. Oct. 1, 2018), on which the Defendants rely in their motion. *See* ECF 38 at 24. There, the plaintiff relied only on "general allegations that Carelink presented false claims and pressured its employees to maximize the number of patient admissions or eligibility recertifications without care to whether the patients were actually eligible for Medicare-provided hospice care." *Id*. at *7. The plaintiff identified four patients about whom she had merely raised concerns about eligibility. *Id*.

Although the Complaint here likewise alleges that NBF and the individual defendants pressured its PAs to order balloon-sinuplasty procedures without respect to Medicare eligibility, it goes much further than that, setting out

facts showing how the individual defendants orchestrated their scheme to falsify patient records to make it appear as though the healthcare provider who had seen the patient had determined medical necessity when in fact no medical-necessity determination had been undertaken before any decision to order a procedure. It alleges:

> "Each of the NBF Defendants submits claims for payment from the government programs under its own discrete National Provider Identification number," ECF 32 at ¶ 17;

> "The Defendants have for years acted in concert to submit and cause the submission of false and fraudulent claims and records to the government programs to obtain payment, in violation of the FCA," *id*. at ¶ 44;

> in accordance with the alleged scheme, "[o]nce a patient's clinical note has been edited and falsified sufficiently to support coverage by the patient's government or private insurer, a non-medical NBF employee affixes the electronic signature of an NBF physician or PA to the note to use as support for the claim for payment submitted to the pertinent government or private insurance program," *id*. at ¶ 59;

> the NBF executives do not permit any of the NBF Defendants' PAs to sign their own clinical notes so that those notes can be altered and falsified before claims for services "backed by those notes are submitted to federal payors for reimbursement," *id.* at ¶ 60; and

> "Once the non-clinical personnel or others have falsified the providers' clinical notes whenever necessary to make a balloon-sinuplasty procedure appear to be medically necessary for the treatment of illness under the pertinent government program's considerations or requirements, and after those notes have been fraudulently 'signed' with the credentials of a medical provider who never reviewed and approved the falsified notes, the pertinent NBF Defendant submits or causes the submission of a claim for payment to the pertinent government program for the patient's balloon-sinuplasty procedure, with each claim including an

express certification that the procedure was medically indicated and necessary for the health of the patient and an implied certification that the true and accurate medical documentation underlying the claim supports coverage," *id.* at ¶ 64.

The Complaint then goes on to set forth specific examples of actual instances in which the clinical notes for patients at one of the NBF clinics were in fact edited, falsified, and signed by someone other than the healthcare provider who had seen the patients. *See* ECF 32 at ¶¶ 80–89. The Complaint identifies the particular federal healthcare program under which each of these patients was covered and, given that each patients' medical records were altered in order to obtain coverage, it alleges that, "on information and belief," a claim for payment was submitted for each patient's balloon-sinuplasty procedure. *Id.* "Allegations of fraud based on information and belief may suffice as to matters peculiarly within the opposing party's knowledge, so long as the allegations are accompanied by a statement of the facts upon which the belief is founded." *Wood v. Tandem Comput. Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987).

Whether the NBF Defendants ultimately submitted particular claims to the federal programs is peculiarly within the Defendants' knowledge. Although Ms. Nemeh did not have direct access to the NBF billing system, she knows that the NBF Defendants altered patient records to ensure that the federal programs would cover and pay for the patients' procedures. Under these circumstances, her allegations "on information and belief" that they indeed submitted claims to

1  government programs are sufficient at this stage in the proceedings to meet Rule

2  9(b)'s requirements.

3  **G.     The Complaint Alleges Conspiracy**

4  To adequately state a claim for conspiracy under the FCA, a complaint

5  must allege "that (1) the defendant agreed with one or more persons to get a false

6  or fraudulent claim allowed or paid by the United States; (2) one or more

7  conspirators performed any act to effect the object of the conspiracy; and (3) the

8  United States suffered damages as a result." *United States v. Vandewater Int'l*

9  *Inc*., 2019 U.S. Dist. LEXIS 222655 (C.D. Cal. Sept. 3, 2019) (citing *Corsello*

10  *v. Lincare, Inc*., 428 F.3d 1008, 1014 (11th Cir. 2005)).

11  As discussed above, the Complaint here sufficiently alleges a scheme to

12  knowingly violate the FCA, as well as the submission of false and material

13  claims. In addition, the Complaint sets out a classic hub-and-spoke conspiracy,

14  with Khanna, Ghanem, and Borane serving as the hub and each of the NBF

15  Defendants serving as the spokes to carry out the conspiratorial scheme, all

16  connected by a rim of shared knowledge that all NBF-affiliated clinics are

17  operating in the same fashion, a shared goal of defrauding the government

18  programs, and actions coordinated through common training and incentives. It

19  contends:

20  - "Together, Khanna, Ghanem, and Borane knowingly devised
21    and implement the fraudulent practices and policies that are
22    described in this Complaint and that the NBF Defendants
23    knowingly support and carry out." ECF 32 at ¶ 2.
24

- "The NBF executives, including Ghanem, Borane, and Khanna, provide training, billing support, and operational management to all of the NBF Defendants so that each of them operates in the same fraudulent manner[.] *Id*. at ¶ 5.

- "Each of the NBF Defendants submits claims for payment from the government programs under its own discrete National Provider Identification number." *Id*. at ¶ 17.

- "Ghanem, Borane, and Khanna devised an unlawful agreement and scheme to violate the FCA by (1) inducing as many patients as possible at all NBF affiliates, including at the NBF Defendants, to undergo a balloon-sinuplasty procedure without any determination of medical necessity; (2) creating false records regarding the patients' underlying symptoms and medical history to create an illusion that the procedure had been ordered based on a determination of medical-necessity rather than on a desire for profits; and (3) billing or causing the billing of the government programs for these procedures as if the procedures had been ordered based on medical necessity and an evaluation of the patients' actual medical history, symptoms, and diagnosis, when in fact they were not." *Id.* at ¶ 48.

- "As Ghanem, Borane, and Khanna created and oversaw each new NBF clinic, including the NBF Defendants, Ghanem, Borane, and Khanna added each clinic as a party to their conspiracy by, as described below, overseeing their operations and requiring them to conform with and participate in NBF's fraudulent practices. All of the NBF Defendants do so with knowledge and intent to violate the FCA." *Id.*

- "Taylor, Borane, Ghanem, and employees at the NBF Defendants under their direction and supervision committed numerous overt acts described [in the Complaint], including editing and falsifying clinical notes to reflect symptoms not observed or to remove symptoms that were observed, or directing or permitting others to do so; affixing forged signatures to clinical notes, or directing or permitting others to do so; submitting or causing the submission of claims to Medicare, Medicaid, and TRICARE supported by those falsified records; and training or causing the training of PAs and other staff

members at all the NBF Defendants to create and use false records for billing purposes." *Id.* at 110.

The Complaint alleges further that all of NBF's PAs at all of its affiliate clinics, including those named in the Complaint, undergo the same training in the fraudulent practices and that those PAs and other medical staff are rewarded for implementing those practices and penalized for failing to do so. ECF 32 at ¶¶ 50, 52. These allegations are not generic assertions that some defendants conspired with others, as the Defendants contend at page 23 of their motion.

Furthermore, the intra-corporate conspiracy doctrine, on which the Defendants rely at pages 23–24 of their motion, does not apply here. That doctrine, derived from antitrust law, holds that a conspiracy requires "an agreement among two or more persons or distinct business entities" and provides, consequently, that a corporate entity cannot conspire with itself. *United States v. Hughes Aircraft Co.*, 20 F.3d 974, 979 (9th Cir. 1994). The Ninth Circuit has never affirmed the application of that doctrine in the FCA context. And the Eleventh Circuit has held that the doctrine does not apply to criminal conspiracies, "even when as here, a plaintiff asserts a civil claim that seeks recovery from a criminal conspiracy." *Bates v. Sequel Youth & Family Servs., LLC*, No. 2:23-CV-01063-RDP, 2024 U.S. Dist. LEXIS 118421, at *35 (N.D. Ala. July 3, 2024) (citing *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000)).

But even if the doctrine applied to qui tam cases, it would not defeat the Complaint's allegations here that the three individual defendants—Ghanem, Borane, and Khanna—conspired with one another, to the allegations that each of the named entities (other than NBF) conspired with them, or to the allegations that each of the named entities conspired with each other. As the Defendants note at page 3 of their motion, NBF is a management services organization, while the named entity defendants are independently owned and operated ENT clinics. The Defendants concede, in other words, that each of the named entities is a separate business entity. This concession is consistent with the allegations in the Complaint that Capitol Breathe Free Sinus and Allergy Centers, LLC, Arizona Breathe Free Sinus & Allergy Centers, LLC, Breathe Free of FL, LLC, Breathe Free Sinus & Allergy Centers of Florida, LLC, SoCal Breathe Free Sinus & Allergy Centers MSO, LLC, Dallas Breathe Free Sinus & Allergy Centers, LLC, and Trinity ENT and Facial Aesthetics, LLC, are all separate corporate entities. *See* ECF 32 at ¶¶ 9–16. The intra-corporate conspiracy doctrine does preclude a finding of conspiracy between the separate corporate entities in these circumstances. *See, e.g., Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, LTD.*, 476 F. Supp. 2d 809, 825 (S.D. Ohio 2007) ("Where more than one corporate entity is allegedly involved in the conspiracy, a conspiracy may be established and is not barred by the intracorporate conspiracy doctrine even though an individual defendant is an officer or agent of both corporations.").

1    Furthermore, the Complaint alleges, and the Defendants confirm, that

2    Khanna, Ghanem and Borane are officers only of NBF. *See* ECF 32 at 7–8.

3    Therefore, unless they served as agents of the other named entities, the intra-

4    corporate conspiracy doctrine would not preclude them from conspiring with

5    those separate legal entities.[1] And whether they did serve as agents of them is a

6    question of fact that cannot be resolved at this stage of the proceedings.

7    **H.    The Complaint Establishes that this Court has Personal**
8    **       Jurisdiction Over all Defendants.**
9

10   "The exercise of personal jurisdiction must 'accord with constitutional

11   principles of due process,' … and comport with 'traditional notions of fair play

12   and substantial justice.'" *Action Embroidery Corp. v. Atl. Embroidery, Inc*., 368

13   F.3d 1174, 1180 (9th Cir. 2004) (quoted citations omitted). "Under *International*

14   *Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945), and

15   subsequent cases, due process is satisfied when the forum state has 'minimum

16   contacts' with a defendant." *Id*. (citing *Securities Inv. Prot. Corp. v. Vigman*,

17   764 F.2d 1309, 1315 (9th Cir. 1985)).

18   As applicable here, 31 U.S.C. § 3732(a) provides that "[a]ny action under

19   section 3730 may be brought in any judicial district in which the defendant or,

20   in the case of multiple defendants, any one defendant can be found, resides,

21   transacts business, or in which any act proscribed by section 3729 occurred."

---

[1] To the extent that the doctrine would preclude them from conspiring
with NBF, Ms. Nemeh requests leave to amend to clarify the conspiracy count.

And, "[w]hen a statute authorizes national service of process … due process demands a showing of minimum contacts *with the United States* with respect to foreign defendants before a court can assert personal jurisdiction." *Action Embroidery*, 368 F.3d at 1180 (9th Cir. 2004) (emphasis added; internal quotation marks and citations omitted); *accord Medical Mut. of Ohio v. deSoto*, 245 F.3d 561 (6th Cir. 2001) (where statutory authority exists for national service of process, the minimum-contacts analysis is altered by applying the national contacts test).

Therefore, numerous district courts have held in qui tam cases like this one that the court can exercise personal jurisdiction over out-of-state defendants so long as the defendant has minimum contacts with the nation as a whole. *See, e.g., United States v. St. Joseph's Reg'l Health Ctr.*, 240 F. Supp. 2d 882, 886 n.1 (W.D. Ark. 2002); *Silbersher v. Valeant Pharms. Int'l, Inc.*, No. 3:18-cv-01496-JD, 2020 U.S. Dist. LEXIS 80866, at *3–*4 (N.D. Cal. May 7, 2020); *United States ex rel. Silingo v. Mobile Med. Examination Servs.*, No. SA CV 13-1348 FMO (SHx), 2015 U.S. Dist. LEXIS 186860, at *12 (C.D. Cal. Sep. 29, 2015), *rev'd in part on other grounds*, 895 F.3d 619 (9th Cir. 2018); *United States ex rel. Landsberg v. Levinson*, Civil Action No. 03-1429, 2006 U.S. Dist. LEXIS 100089, at *8 (W.D. Pa. Mar. 7, 2006) (citing cases consistently holding that, "in FCA cases only minimum contacts with the United States as a whole are required" to establish personal jurisdiction). The Complaint here meets these requirements. *See* ECF 32 at 4–6.

1    *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836

2    n.13 (9th Cir. 2004), on which the Defendants rely at page 32 of their motion

3    does not establish otherwise. When the Ninth Circuit said in that case that section

4    3732(a) "delineates proper *venue* for FCA actions, not *jurisdiction* over such

5    claims," it was referring to subject-matter jurisdiction, rather than personal

6    jurisdiction. (Emphasis in original.)

7        In any event, even if *Universal Fruits* was inconsistent with *Action*

8    *Embroidery*, *Action Embroidery* would govern here under the law-of-the-circuit

9    rule. That rule provides that a published decision of the Ninth Circuit

10   "constitutes binding authority which 'must be followed unless and until

11   overruled by a body competent to do so.'" *Gonzalez v. Arizona*, 677 F.3d 383,

12   389 n.4 (9th Cir. 2012) (*en banc*) (quoted citation omitted). Circuit precedent is

13   considered effectively overruled only if intervening Supreme Court authority has

14   "undercut the theory or reasoning underlying the prior circuit precedent in such

15   a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889,

16   900 (9th Cir. 2003) (*en banc*). No such opinion has undercut *Action Embroidery*.

17   **II.    Binding Precedent Establishes that the Qui Tam Provisions of the**
18   **        FCA are not Unconstitutional.**

19       In *Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993), the Ninth Circuit ruled

20   that the FCA's qui tam provisions do not violate the Appointments Clause of the

21   Constitution. Although the Defendants contend at page 34 of their motion that

22   *United States ex rel. Polansky v. Exec. Health Res.*, Inc., 599 U.S. 419, 425, 437

1  (2023), and *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 219

2  (2020), "cast doubt on *Kelly*," *Kelly* remains binding on this Court unless and

3  until the Supreme Court or the Ninth Circuit, sitting *en banc*, actually overrules

4  it. *See Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("Binding

5  authority must be followed unless and until overruled by a body competent to

6  do so.").

7       Consequently, this Court continues to abide by *Kelly* and to reject any

8  constitutional challenge to the qui tam provisions premised on the Appointments

9  Clause. *See United States ex rel. Stenson v. Radiology Ltd., LLC*, No. CV-19-

10  00306-TUC-JGZ, 2025 U.S. Dist. LEXIS 122351, at *5 (D. Ariz. June 26, 2025)

11  (ruling that the same issues that the Defendants raise here are "foreclosed by

12  binding circuit precedent"); *United States ex rel. Thomas v. Mercy Care*, No.

13  CV-22-00512-PHX-JAT, 2023 U.S. Dist. LEXIS 201363, at *13 (D. Ariz. Nov.

14  9, 2023) ("This Court will abide by the binding precedent of the Ninth Circuit in

15  *Kelly*."). All other district courts to address the issue, save one—the United

16  States District Court for the Middle District of Florida—have likewise rejected

17  challenges to the constitutionality of the qui tam provisions. *See United States*

18  *ex rel. Permenter v. eClinicalWorks, LLC*, No. 5:18-cv-382 (MTT), 2025 U.S.

19  Dist. LEXIS 120330, at *30 (M.D. Ga. June 25, 2025) ("Thus far, only one

20  district court has ruled that the FCA's qui tam provisions are unconstitutional.")

21  (citing *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d

22  1293 (M.D. Fla. Sept. 30, 2024); *United States ex rel. Gose v. Native Am. Servs.*

*Corp.*, 2025 U.S. Dist. LEXIS 101549  (M.D. Fla. May 29, 2025)). This Court should do the same here.

**III.    If Necessary, Relator Nemeh Requests Leave to Amend and Requests Expedited Discovery.**

If this Court determines that any aspect of her Complaint is deficient, Relator Nemeh requests leave to amend. As the Defendants concede, "[w]hen a plaintiff seeks to amend a complaint, a "court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

Relator Nemeh's Complaint describes a patently fraudulent scheme to defraud the United States' government healthcare programs, which has caused the United States to lose millions of dollars. If this Court determines that her allegations are not sufficiently detailed to meet Rule 12(b)(6)'s or Rule 9(b)'s requirements, it would certainly be in the interests of justice to allow her an opportunity to amend to cure any deficiencies. At this very early stage in the proceedings, it would not be in the interests of justice to allow the Defendants to escape liability merely because of curable defects in the Complaint.

In addition, if the Court grants Defendants' Motion, Relator requests an opportunity to conduct expedited discovery so that she can address any subject-matter-jurisdiction issues or questions regarding the nature of the NBF Defendants and their legal relationship to each other and the individual defendants. Federal Rule of Civil Procedure 26(d)(1) allows discovery before the Rule 26(f) conference upon court order. "Discovery should be granted when,

as here, the jurisdictional facts are contested or more facts are needed." *Laub v. United States DOI*, 342 F.3d 1080, 1093 (9th Cir. 2003) (citing cases). The Defendants should not be permitted to evade discovery by arguing that the Complaint lacks specifics while simultaneously withholding the very evidence that would provide those specifics. The proposed discovery will be proportionate and narrowly tailored to the issues raised by the Defendants in the Motion, information about which is in their exclusive possession, custody, or control.

**IV. Conclusion**

For all of these reasons, Relator Nemeh requests this Court to deny the Defendants' Motion to Dismiss. Alternatively, Relator Nemeh requests this Court to afford her leave to amend to cure any deficiencies in the Complaint and to conduct limited expedited discovery.

DATED: December 16, 2025

Respectfully submitted,

*/s/ Alina Veneziano*
Alina Veneziano
Arizona Bar Number 039347

*/s/ Linda Julin McNamara*
Linda Julin McNamara
Admitted *Pro Hac Vice*
Florida Bar Number 0714887

Oberheiden P.C.
13155 Noel Road, Suite 900
Dallas, TX 75240
Alina@federal-lawyer.com
Linda@federal-lawyer.com
**Attorneys for Relator**
**Michelle Nemeh**

**Certificate of Service**

I hereby certify that on December 16, 2025, this document was served on all parties of record via CM/ECF filing.

/s/ *Linda Julin McNamara*
Linda Julin McNamara