**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Michelle Nemeh,

        Plaintiff,

v.

National Breathe Free Sinus & Allergy Centers LLC, *et al.*,

        Defendants.

No. CV-23-02009-PHX-JJT

**ORDER**

At issue is Defendants' Motion to Dismiss Amended Complaint (Doc. 38, Mot.), to which Plaintiff-Relator Michelle Nemeh ("Relator") and Plaintiff-in-Interest United States of America ("Government") separately responded (Doc. 42, Rel. Resp.; Doc. 46, Gov't Resp.), and Defendants replied (Doc. 47, Reply). The Court finds this matter appropriate for resolution without oral argument. LRCiv 7.2(f). For the reasons below, the Court will grant in part and deny in part Defendants' Motion.

## I.    BACKGROUND[1]

The following facts are drawn from Relator's First Amended Complaint (Doc. 32, FAC). Defendant National Breathe Free Sinus & Allergy Centers LLC ("NBF") was founded by Defendants Dr. Manish Khanna and Nabiel Matthew Ghanem to provide ear, nose, and throat ("ENT") healthcare. (FAC ¶ 2.) NBF has its principal place of business in Phoenix, Arizona and does business as "Scottsdale Sinus and Allergy Center," "Oasis Ear, Nose, and Throat," and "Premier Sinus and Allergy Center." (FAC ¶ 9.) The executives of

---

[1] When referring to papers submitted by the parties, the Court cites to the page number as generated by the Electronic Court Filing system, not the parties' own page demarcation.

NBF include Mr. Ghanem, Dr. Khanna, and Defendant Taylor Borane. (FAC ¶¶ 18–20.) NBF has grown to affiliate with thirty clinics across the country. (FAC ¶ 4.) Of those affiliates, seven are named as defendants here and two of them are located in Arizona, one in Texas, one in California, one in Washington D.C., and two in Florida. (FAC ¶¶ 10–16.)

Relator is a physician assistant and worked first for Scottsdale Sinus and Allergy Center and then an affiliate clinic named Trinity ENT and Facial Aesthetics, LLC, both located in Arizona. (FAC ¶ 7). Relator brings a *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–30, alleging a nationwide scheme by NBF and its affiliates to submit false claims to Medicare, Medicaid, Tricare, and Medicare Advantage ("Government Programs"). Specifically, Relator alleges Defendants systematically pushed balloon sinuplasties on patients without determining whether those procedures were medically necessary then falsified medical records to support claims for payment to the Government Programs. (*See* FAC ¶¶ 1, 5, 44, 48.)

A balloon sinuplasty involves the insertion and inflation of a balloon catheter into the sinus cavity to reduce pressure and improve drainage. (FAC ¶ 45.) Such procedures cost between $5,000 and $14,000. (FAC ¶ 46.) To submit a claim for payment for balloon sinuplasties to Government Programs, a provider certifies by his or her signature that the services billed were medically necessary based on the patient's medical history, complaints and diagnosis. (FAC ¶¶ 29, 31, 36–38.) Medical necessity must be supported by the patient's medical records. (FAC ¶¶ 32, 36–28, 47.) Medical necessity for balloon sinuplasties is generally established when a patient has recurrent sinus infections that are unresponsive to medication, intractable sinus pain, or an affected sinus area in the cheeks, forehead, or back of the nose. (FAC ¶ 46.) The procedure is generally not deemed to be "medically necessary" if a patient has not tried more conservative treatment like medication or has sinus issues that are acute or caused by polyps or a deviated septum. (FAC ¶ 46.)

NBF developed and implemented a training protocol that instructed physician assistants and medical assistants inexperienced in the ENT field to use scripted "talk

tracks" to promote balloon sinuplasties during all first visits regardless of the patient's symptoms or diagnosis. (FAC ¶¶ 49–50.) Dr. Khanna emphasized to physician assistants the importance of these talk tracks, and the NBF executives instructed physician assistants during training and afterwards that all first-time patients should be encouraged to book a balloon sinuplasty. (FAC ¶¶ 50–51.) Dr. Khanna even told Relator that he competed with another NBF physician to book a higher number of balloon sinuplasties. (FAC ¶ 51.) Relator received this training in August and September 2021 shortly after she was hired. (FAC ¶ 90.)

Relator describes several policies used by Defendants to ensure balloon sinuplasties were booked and paid. For example, Defendants performed "free" CT scans on nearly all new patients using untrained medical assistants, interpreted those scans to suggest the patient needed a balloon sinuplasty, hid from regulators and payors that medical assistants performed CT scans, and ordered repeat scans to meet insurance criteria. (FAC ¶¶ 74–78.) Defendants also instructed physician assistants to document that a patient attempted to use antibiotics to address their sinus issues even if they had not so the medical records would falsely suggest that a ballon sinuplasty was the next necessary treatment step. (FAC ¶¶ 54, 56.) Defendants would also set quotas for booking rates pursuant to NBF's expectations and used a reward system that included gifts to incentivize more bookings. (FAC ¶ 52.)

Physician assistants were also instructed not to sign medical records so non-medical "Auth Teams" could later edit or create templated "Z-Auths" adding or altering symptoms, antibiotic history, and other facts material to medical necessity before finalizing the medical records. (FAC ¶¶ 53–54, 57, 61.) For example, Relator noticed that administrative staff removed from the clinical notes she prepared that a patient possibly had polyps, which would have made that patient a poor candidate for a balloon sinuplasty. (FAC ¶ 94.) Auth Teams would also add notes to support the delivery of other procedures concurrent with balloon sinuplasties that reduce nasal anatomy to improve congestion, regardless of whether the observing medical professional initially recommended those additional procedures. (FAC ¶ 72.) Administrative staff affixed forged electronic signatures of

physicians, including that of Dr. Khanna, to finalize the medical records. (FAC ¶¶ 59–60.) Defendants then submitted or caused the submission of claims that expressly and impliedly certified that a balloon sinuplasty was medically necessary based on the edited medical records. (FAC ¶ 64.) NBF clinics each performed between one and forty balloon sinuplasties each month between 2022 and 2023. (FAC ¶ 66.)

Relator recounts ten patients' records kept at Trinity ENT. Each patient presented with non-sinus complaints or had not attempted less invasive treatment for sinus complaints but agreed to balloon sinuplasty recommendations, and those records were later edited by administrative staff to include contradictory or fabricated symptoms, altered antibiotic histories, and forged provider signatures before the claims were submitted to the Government Programs. (FAC ¶¶ 79–89.) Relator describes other examples of observing changes made to patient medical records she wrote that were false or misleading and resulted in that patient receiving an unnecessary balloon sinuplasty. (*See* FAC ¶¶ 94–96.)

Relator sues Defendants on behalf of the United States for violations of the first three subsections of 31 U.S.C. § 3729(a)(1): (1) presentation of false claims for balloon sinuplasties and related services under subsection (A); (2) presentation of false records or statements material to false claims under subsection (B); and (3) conspiracy to violate the FCA under subsection (C).

## II.    CONSTITUTIONALITY OF QUI TAM PROVISION

The Court addresses Defendants' arguments for dismissal in reverse order, beginning with their constitutional challenge the *qui tam* provision of the FCA that provides the basis for all Relator's claims. Defendants argue that the *qui tam* provision violates Article II of the U.S. Constitution by infringing on the authority vested solely in the executive branch under the Appointments Clause. (Mot. at 33.) According to Defendants, the Supreme Court in *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020) and *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023) cast doubt upon the Ninth Circuit's holding in *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993) that the *qui tam* provision did not

violate Article II of the Constitution. (Mot. at 34.) Under Defendants' reading, those Supreme Court cases held that the right given to relators to bring an action in the name of the Government under the FCA was a "quintessentially executive power" that is vested in the executive branch alone under the Appointments Clause. (Mot. at 34.) Defendants point out that one district court in Florida relied on *Seila Law* and *Polansky* to determine that the FCA's *qui tam* provision is unconstitutional in *United States ex rel. Zafirov v. Florida Medical Associates, LLC,* 751 F. Supp. 3d 1293 (M.D. Fla. 2024). (Mot. at 34–35.)

Both Relator and the Government[2] dispute Defendants' characterization of the current landscape of binding authority. Relator argues that neither *Seila Law* nor *Polansky* expressly overruled *Kelly*. Relator cites two cases from this District that rejected the exact argument made by Defendants here. *See United States ex rel. Stenson v. Radiology Ltd., LLC*, No. CV-19-00306-TUC-JGZ, 2025 WL 1785266, at *2 (D. Ariz. June 27, 2025); *United States ex rel. Thomas v. Care*, No. CV-22-00512-PHX-JAT, 2023 WL 7413669, at *4 (D. Ariz. Nov. 9, 2023). In addition to those two cases, the Government cites an overwhelming number of district and Circuit cases across the country that have similarly dispensed with the same constitutional challenge. (Gov't Resp. at 1–2.) The Government also sets forth detailed and substantive arguments that the *qui tam* provision of the FCA does not violate the Appointments Clause. (Gov't Resp. at 3–11.)

Defendants respond to no part of the Government's substantive argument or attempt to distinguish any of the dozens of cases cited in the responsive papers. Defendants' only argument in reply is that this Court should "follow the studied decision in [*Zafirov*]." This argument is hollow and unpersuasive. First, Defendants do not explain how *Seila Law* or *Polansky* could be read to invalidate the entire *qui tam* provision of the FCA. In *Seila Law*, the Supreme Court held that the Consumer Financial Protection Bureau's leadership structure, which at the time was led by a single director removable for only limited reasons, violated Article II and the separation of powers. 591 U.S. at 213. In *Polansky*, the Supreme

---

[2] The Government's responsive brief only addresses Defendants' constitutional challenge to the FCA and "takes no position on Defendants' other arguments" for dismissal. (Gov't Resp. at 1 n.1.)

Court held that the Government may dismiss the FCA action at any time after it intervenes and such voluntary dismissal is evaluated under Federal Rule of Civil Procedure 41. 599 U.S. at 428–29. To extend these holdings would require several leaps in reasoning not made by Defendants here. Second, the district court's opinion in *Zafirov* does not convince this Court that *Seila Law* and *Polansky* announce case law that is so incongruent with *Kelly* as to implicitly overrule it. Ultimately, this Court finds no reason to disregard binding Ninth Circuit authority and the nationwide circuit trend on the account of "[a] single, outlier trial-court decision that whistles past precedent binding upon this Court." *United States v. Chattanooga Hamilton Cnty. Hosp. Auth.*, No. 1:21-CV-84, 2024 WL 4784372, at *3 (E.D. Tenn. Nov. 7, 2024) (rejecting the constitutional challenge to the FCA *qui tam* provision and declining to follow *Zafirov*); *see Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("Binding authority must be followed unless and until overruled by a body competent to do so.").

## III.    PERSONAL JURISDICTION

The Court next considers the Defendants' penultimate argument for partial dismissal of claims against several non-resident entities for want of personal jurisdiction.

### A.    Legal Standard

For a federal court to adjudicate a matter, it must have jurisdiction over the parties. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). There are two types of personal jurisdiction: general and specific. General jurisdiction is not at issue here. Rather, Defendants argue that the Court lacks specific personal jurisdiction over Capitol Breathe Free Sinus and Allergy Centers, LLC, Breathe Free of Florida, LLC, Breathe Free Sinus & Allergy Centers of Florida, LLC; Dallas Breathe Free, and SoCal Breathe Free Sinus & Allergy Centers MSO, LLC, all non-residents of the State of Arizona. (Mot. at 31.)

To exercise specific personal jurisdiction over a non-resident defendant, due process requires that the defendant have sufficient minimum contacts with the forum so that "maintenance of the suit does not offend traditional notions of fair play and substantial

justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation modified). The traditional "minimum contacts test" focuses "on the relationship among the defendant, the forum, and the litigation." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750 (9th Cir. 2025).

Federal Rule of Civil Procedure 4(k)(2), known as the "federal long-arm statute," establishes specific personal jurisdiction over a defendant if the following three conditions are met: (1) the claims arise under federal law; (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (3) exercising jurisdiction comports with due process. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006); *see* Fed. R. Civ. P. 4(k)(2). The due process analysis under Rule 4(k)(2) "is nearly identical to traditional personal jurisdiction analysis but rather than considering contacts between the defendant and the forum state, we consider contacts with the nation as a whole." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th Cir. 2021) (citation modified).

**B.    Analysis**

In pleading that this Court has personal jurisdiction over all Defendants, Relator cites to 31 U.S.C. § 3732(a) that states:

> Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States.

Relator contends that § 3732(a) allows nationwide service of process, which means that the relevant forum to which the minimum contacts test is applied is the nation as a whole, not just the State of Arizona. (Rel. Resp. at 25–26.)

Defendants argue that § 3732(a) relates to venue, not jurisdiction, so Relator must meet the traditional specific minimum contacts test with the relevant forum being the State of Arizona. (Mot. at 32.) In support of their position, Defendants rely on *United States v.*

*Universal Fruits & Vegetables Corp.*, 370 F.3d 829 (9th Cir. 2004). There, the Government brought an FCA claim against the defendant company for avoiding customs duties. *Id.* at 831. The narrow question presented to the Ninth Circuit was whether the district court or the Court of International Trade had subject-matter jurisdiction over the FCA claim. *Id*. In answering that question, the Ninth Circuit was persuaded by *U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, in which the Second Circuit held that § 3732(a) "does not govern subject matter jurisdiction." 110 F.3d 861, 863 (2d Cir. 1997). Neither case dealt with personal jurisdiction at all.

There is only one other Ninth Circuit case discussing § 3732(a) in the context of personal jurisdiction. In an unpublished opinion, the Ninth Circuit "assess[ed] [the defendant's] conduct on a nationwide basis because 31 U.S.C. § 3732(a) authorizes nationwide service of process." *Silbersher v. Valeant Pharms. Int'l, Inc.*, No. 20-16256, 2023 WL 4946736, at *1 (9th Cir. Aug. 3, 2023). The court quoted *Go-Video, Inc. v. Akai Electric Co. Ltd.*, which held that the "national contacts analysis more often finds its basis . . . in the concrete language of a statute under which Congress has, as it is unquestionably empowered to, authorized nationwide service of process." 885 F.2d 1406, 1416 (9th Cir. 1989) (citations and quotation marks omitted). Therefore, "when a statute authorizes nationwide service of process, national contacts analysis is appropriate." *Id*.

*Silbersher* acknowledges that § 3732(a) authorizes nationwide service of process, and that statutory feature means that a nationwide contacts analysis is appropriate under *Go-Video*. While not binding authority, the Court finds *Silbersher* persuasive in light of the express language of § 3732(a), which states that "[a] summons . . . shall be issued by the appropriate district court and served ***at any place*** within or outside the United States." (emphasis added). This language is expansive and like other federal statutes known to authorize nationwide service of process. *See* 7 U.S.C. § 25(c) ("Process in such action may be served in any judicial district of which the defendant is an inhabitant or wherever the defendant may be found."); 15 U.S.C. § 22 ("[A]ll process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."); *Cox v.*

*CoinMarketCap OPCO, LLC*, 112 F.4th 822, 833 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2846 (2025) (holding that 7 U.S.C. § 25 authorizes nationwide service of process and applying the nationwide contacts test); *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (same as to 15 U.S.C. § 22).

In reply, Defendants argue that many district courts in this Circuit have required a relator to plead sufficient minimum contacts between the defendant and the forum state rather than using a nationwide contacts test. (Reply at 14–15 (collecting cases).) To Defendants' credit, the Court acknowledges that, in this Circuit, "[d]istrict courts are split whether [§ 3732(a)] authorizes personal jurisdiction based on a defendant's nationwide contacts rather than contacts with the district where the action is pending." *Southard v. Kipper Tool Co.*, No. 3:15-CV-03621-JSC, 2023 WL 6959145, at *2 (N.D. Cal. Oct. 19, 2023) (collecting cases). Still, all the district court cases cited by Defendants are outside this District and unreported, or if they are reported they do not acknowledge *Go-Video*'s holding that nationwide contacts analysis is appropriate where, as here, the statute authorizes nationwide service of process. (Mot. at 31–32; Reply at 15.)

In light of *Go-Video* and the express language of § 3732(a) that authorizes nationwide service of process, the Court agrees with Relator that the nationwide contacts test is appropriate. Defendants do not challenge any of the three conditions permitting the nationwide contacts test established by *Pebble Beach Co.* discussed *supra*, or that they each have sufficient minimum contacts with the nation as a whole. Accordingly, the Court declines to dismiss Relator's claims for want of personal jurisdiction.

## IV.    RULES 12(B)(6) AND 9(B)

Defendants' only remaining argument for dismissal turns on whether Relator sufficiently states her claims under both Rule 12(b)(6) and Rule 9(b).

### A.    Legal Standard

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) the

absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

"To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint generally must satisfy only the minimal notice pleading requirements of Rule 8(a)(2)." *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). However, when as here "a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b) requires more specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation modified). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation modified). Put simply, Rule 9(b) requires "the who, what, when, where, and how of the misconduct charged." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (citation omitted).

**B.      Analysis**

The three subsections giving rise to Relator's FCA claims make "any person who—(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or

statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B) . . . liable to the United States Government." 31 U.S.C. § 3729(a)(1). Relator's FCA claims each present a "false certification" theory of liability. In "[f]alse certification cases . . . parties avail themselves of benefits of some type . . . through false statements which create eligibility that otherwise would not exist." *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996).

> i. ***Counts One and Two***

To sufficiently plead a false certification claim under subsections § 3729(a)(1)(A)-(B) of the FCA, "[a] plaintiff must allege: (1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing, (4) the government to pay out money or forfeit moneys due." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1114 (9th Cir. 2020). "[T]he Act attaches liability, not to underlying fraudulent activity, but to the 'claim for payment.' What constitutes the FCA offense is the knowing presentation of a claim that is either fraudulent or simply false." *Hopper*, 91 F.3d at 1266 (citation modified). Rule 9(b) requires such allegations to be particular and "provide a reasonable basis to infer that (1) the defendant explicitly undertook to comply with a law, rule or regulation that is implicated in submitting a claim for payment and that (2) claims were submitted (3) even though the defendant was not in compliance with that law, rule or regulation." *Ebeid*, 616 F.3d at 998. To do so, a plaintiff may either plead a "representative example" of the fraud or "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 998–99.

Defendants argue that Relator fails to plead each of the four elements that make up an FCA claim under the heightened pleading standard imposed by Rule 9(b). The Court evaluates each element in turn.

> a. *Falsity or Fraudulent Course of Conduct*

In the Ninth Circuit, courts do not require "a plaintiff to plead an 'objective falsehood'" to state a claim under the FCA. *Winter*, 953 F.3d at 1119. As relevant here,

"[b]ecause medical necessity is a condition of payment, every Medicare claim includes an express or implied certification that treatment was medically necessary. Claims for unnecessary treatment are false claims." *Id*. Accordingly, a plaintiff may plead falsity by alleging facts showing that a physician's certification was either: (1) based on an opinion that was not honestly held; or (2) implies facts that do not exist. *Id*.

First, Defendants contend that Relator does not sufficiently plead facts to suggest that Defendants' physicians did not honestly believe that balloon sinuplasties were medically necessary for the patients that received them. (Mot. at 7.) But Relator alleges that Defendants relegated patient visits to physician assistants, that physicians were removed from the process of developing proper treatment plans for patients, and that physicians' signatures certifying medical necessity were forged. Under this theory, the Court can reasonably infer that Defendants' physicians did not honestly hold whatever opinions were contained in patient records or the claim because they did not form those opinions.

Second, Defendants assert that Relator failed to allege that the certifications of medical necessity implied facts that did not exist. (Mot. at 16–17.) As Relator points out, allegations of that sort are abundant in the First Amended Complaint, and the Court can easily infer from the facts alleged that the certifications did imply nonexistent facts.

Defendants contend that Relator fails to assert any basis in law, regulation, governmental guidance, or medical consensus to support her allegations "that sinuplasty patients [must] meet certain alleged 'prerequisite requirements,' such as being treated with antibiotics in the past year" before a sinuplasty would be deemed "medically necessary." (Mot. at 17.) But Relator references several parts of the Code of Federal Regulations, United States Code, and Government Program manuals in pleading her allegations regarding billing requirements. (FAC ¶¶ 26–40.) Relator also alleges when a balloon sinuplasty is a necessary procedure and when it is not. (FAC ¶ 46.) Defendants point out no particular law or authority that contradicts the legal basis for Relator's allegations.[3]

---

[3] Defendants suggest that "published literature supports that balloon sinuplasties are effective, minimally invasive and relatively low risk, and are prescribed for a variety of

- 12 -

Defendants lastly contend that Relator fails to assert that the medical records as edited by administrative staff "actually influenced physician decision-making." (Mot. at 19.) Whether a physician was influenced by the records is more relevant to whether the physician honestly believed that the procedure was necessary. In any event, though, the Court can infer from Relator's allegations that physicians had little to no involvement in patient treatment, so whether they would have been influenced by the falsified records is inapplicable to Relator's theory of the case. Rather, the claims here are clearly based on allegations showing that administrative staff injected nonexistent facts into patient records and forged a physician's signature formalizing those records all unbeknownst to the physician so that NBF or its affiliates could be paid for balloon sinuplasty claims. At this stage, these allegations sufficiently state that the claims submitted by Defendants to the Government were false.

b.      *Scienter*

Unlike the other elements of an FCA claim, "scienter need not be pleaded with particularity, but may be alleged generally." *Winter*, 953 F.3d at 1122 (citations omitted). "A complaint therefore must set out sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred" but need not reach the pleading standard set forth in Rule 9(b). *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679–80 (9th Cir. 2018). Facts supporting that a defendant had "either actual knowledge, deliberate ignorance, or recklessness will suffice." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023). "First, the term 'actual knowledge' refers to whether a person is 'aware of' information. Second, the term 'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false but intentionally avoid taking steps to confirm the statement's truth or falsity. And third, the term 'reckless disregard' similarly captures defendants who are conscious of a

---

conditions based on factors that may vary from case to case and from physician to physician." (Mot. at 18.) This may ultimately be true, and Relator's own allegations suggest that balloon sinuplasties can be effective treatment. (FAC ¶ 45.) But the basis of her allegations is that, at least for some patients receiving care through NBF and its affiliates, balloon sinuplasties are *unnecessary*.

- 13 -

substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id*. at 751.

Defendants argue that Relator fails to plead facts suggesting that Defendants submitted false claims with the intent to defraud or facts supporting a "strong inference" of that intent. But the cases cited by Defendants for this proposition are not within the Ninth Circuit, and binding authority here states that, "unlike in common law fraud claims, a plaintiff need not prove a 'specific intent to defraud' under the FCA." *Winter*, 953 F.3d at 1122. The Court declines to impose a harsher standard than what is required by *Winter*.

Here, Relator sufficiently pleads that Defendants were, at minimum, conscious of a substantial and unjustifiable risk that the claims they submitted for balloon sinuplasties were false but submitted them anyway. First, NFB and affiliates trained and instructed staff to "convince as many patients as possible . . . to undergo a balloon-sinuplasty procedure without any consideration of medical necessity." (FAC ¶ 45.) At the direction of NFB, affiliates set quotas for scheduling first-time patients for balloon sinuplasties regardless of the patient's medical complaints. (FAC ¶ 52.) The healthcare professionals who exceeded the NFB executives' expectations were rewarded (FAC ¶ 52), while those who failed to meet or questioned those expectations were scrutinized, punished, or in one instance fired (FAC ¶¶ 52, 91, 93). These facts suggest that Defendants motivated their employees to submit claims for ballon sinuplasties even if they were unnecessary, thereby creating a substantial and unjustifiable risk that at least some of the claims would be false.

Second, NFB and its affiliates maintained a policy that healthcare professionals would keep a patient's medical records "open" and unsigned so that administrative staff could edit and formalize them without giving healthcare professionals the opportunity to review the edits. (FAC ¶¶ 60, 64.) In other words, Defendants took active steps to screen out healthcare professionals capable of vetting that documentation for accuracy so that the edits containing false information would be preserved. This suggests that Defendants were aware or conscious that at least some of the records that were submitted were false.

. . .

- 14 -

These facts, when taken as true, show that Defendants were "conscious of a substantial and unjustifiable risk that their claims are false." *Schutte*, 598 U.S. at 751; *see also United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 904 (9th Cir. 2017) (finding allegations that a defendant established practices and took actions to hide fraud, such as altering documents, were sufficient to plead scienter).

### c.    *Materiality*

"For a false statement to be material, a plaintiff must plausibly allege that the statutory violations are 'so central' to the claims that the government 'would not have paid these claims had it known of these violations.'" *Winter*, 953 F.3d at 1121. In the Ninth Circuit, courts deem "a false certification of medical necessity" as material. *Id.* at 1122. "The medical necessity requirement is not an insignificant regulatory or contractual violation. Congress prohibited payment for treatment not reasonable and necessary for the diagnosis or treatment of illness or injury." *Id.* (citation modified).

Here, Relator pleads that the claims submitted to the Government contained a false express or implied certification that balloon sinuplasties were medically necessary and that the Government would not have paid those claims absent the false certification. (FAC ¶ 65.) Under the Ninth Circuit case law, these allegations meet the materiality element of a FCA claim. *Winter*, 953 F.3d at 1122.

### d.    *Causation*

"The causation element under 31 U.S.C. § 3729 is satisfied if a person 'presents, or causes to be presented,' a false or fraudulent claim to the United States for payment or approval . . . Thus, a person need not be the one who actually submitted the claim forms in order to be liable." *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001) (citation modified). District courts in the Ninth Circuit "use general tort law principles to analyze the FCA's causation element," and "[u]nder those principles, a defendant may be liable for false claims that others submit if its conduct was a substantial factor in bringing about the false claims, and such claims were a foreseeable and natural consequence of its conduct." *United States ex rel. Puhl v. Terumo BCT*, No. CV 17-8446 PSG (JPRX), 2019 WL

6954317, at *4 (C.D. Cal. Sept. 12, 2019). It is not enough to describe conduct that is merely unsavory, *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011), or "to describe a private scheme in detail but then to allege simply and without any stated reason for [the] belief that claims requesting illegal payments must have been submitted," *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002) (citation omitted). Rather, a plaintiff "must show an actual false claim for payment being made to the Government." *Id.* (emphasis and citation omitted).

Defendants argue that Relator fails to plead that Defendants engaged in anything more than "unsavory conduct." (Mot. at 24.) The Court disagrees. Relator sufficiently alleges the Government requires a claim submitted for payment to be medically necessary and supported by sufficient documentation (FAC ¶¶ 29–40), sets forth specific examples of medical documentation that were falsified to meet this standard for payment (FAC ¶¶ 80–89), and alleges that those claims were submitted anyway (*id.*). If true, this conduct was not merely unsavory; it was fraudulent.

As for whether Relator sufficiently pleads that claims were actually submitted to the Government for payment, the Court can infer from the alleged facts that they were. Relator pleads a detailed scheme to encourage healthcare professionals to schedule unnecessary balloon sinuplasties and to falsify supporting medical documentation formalized by forged signatures of healthcare professionals. Each month between 2022 and 2023, one to forty patients at NBF clinics who were insured by Government Programs received balloon sinuplasties. (FAC ¶ 66.) This allegation supports the inference that, under the detailed scheme, some portion of those procedures were unnecessary. At least two of Relator's own patients, L.P. and R.S., were insured by Government programs and Relator observed that their medical records were altered by administrative staff. (FAC ¶¶ 84–85.) According to Relator, L.P. and R.S. ultimately received balloon sinuplasties, and the Court can infer that Trinity ENT submitted the edited records to support claims for payment for those two balloon sinuplasties to the Government. The facts alleging the detailed scheme adopted by NBF and its affiliates and the representative examples of L.P. and R.S., when taken

together and presumed to be true at this stage, are sufficient to allege that NBF and its affiliates caused or were a substantial factor in bringing about the submission of false claims to the Government.

Defendants' citation to an unpublished Northern District of California case does not change the Court's conclusion here. In *United States ex rel. Armstrong-Young v. Carelink Hospice Services, Inc.*, a social worker brought FCA claims against her employer for allegedly submitting false claims for payment to Medicare for patients who were ineligible for the billed services. No. 15-cv-04095, 2018 WL 4773111, at *1 (N.D. Cal. Oct. 1, 2018). There, the social worker generally alleged that she believed claims were submitted but did not plead any particular facts or reasonable indicia of facts that would allow the court to "infer that claims had been submitted on behalf of any particular patient." *Id*. at *3.

But Relator does identify specific patients she saw at Trinity ENT who were insured by Government programs, had their medical records altered from the time Relator saw them, and ultimately received balloon sinuplasties. There are also sufficient and reliable indicia to suggest that at least a portion of the one to forty balloon sinuplasties eventually billed to Government Programs were unnecessary due to the specific and detailed scheme enforced by NBF executives and affiliates.

### e.    *Group Pleading*

"Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz*, 476 F.3d at 764–65 (citation modified). "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme." *Id.* at 765 (citation modified). "There is no flaw in a pleading [] where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct," so long as there are "particular details of the scheme as applied to defendants []." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016).

Defendants argue that Relator's claims fail under Rule 9(b) for "grouping of defendants into categories." (Mot. at 23.) According to Defendants, the lack of any substantive allegations about Arizona Breathe Free, Breathe Free of Florida, LLC, Breathe Free Sinus & Allergy Centers of Florida, LLC, SoCal Breathe Free, or Dallas Breathe Free requires the FCA claims to be dismissed against them. (Mot. at 27.)

Relator argues that she identified the roles of each above-named defendant as affiliates of NBF that carry out the scheme devised by NBF. (Rel. Resp. at 16–17.) Relator points to three categories of allegations to support that her pleading meets the Rule 9(b) standard. First, Relator alleges that all healthcare providers and administrative staff who work for NBF affiliates attend the same training that Relator attended where she was trained to convince patients to undergo balloon sinuplasties. (Rel. Resp. at 16–17.) Second, Relator alleges that NBF and its affiliates incentivize their staff to book as many sinuplasties as possible in accordance with NBF policy. (Rel. Resp. at 17.) Third, Relator alleges in great detail that NBF and its affiliates implement administrative teams to edit and sign patient records before submitting those records in support of claims for balloon sinuplasties. (Rel. Resp. at 17.) These events occurred at least since 2018 and led NBF and its affiliates to perform between one and forty balloon sinuplasties per month between 2022 and 2023 on patients insured by Government Programs. (FAC ¶ 66.) Relator's allegations provide all named Defendants sufficient notice about the training, policies, type of records, type of procedure, and type of insurance claims such that they can investigate and prepare accordingly. This amounts to "the who, what, when, where, and how of the misconduct charged" as required by Rule 9(b). *Ebeid*, 616 F.3d at 998 (citation omitted).

ii.    ***Count Three***

"To maintain a claim for conspiracy under 31 U.S.C. § 3729(a)(3), a plaintiff must show (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *U.S. ex rel. Woodruff v. Hawaii Pac. Health*, 560

F. Supp. 2d 988, 998 (D. Haw. 2008), *aff'd*, 409 F. App'x 133 (9th Cir. 2010) (citation modified). "It is not necessary to show that the conspirators intended the false record or statement to be presented directly to the Government, but it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 673 (2008).

Defendants argue the conspiracy claim must fail because the only factual allegations that support a conspiracy relate to an agreement made among the three NBF executives but do not detail any agreement between NBF and its affiliates. (Mot. at 29–30.) Relator responds that her conspiracy theory is one of "a classic hub-and-spoke . . . with Khanna, Ghanem, and Borane serving as the hub and each of the [affiliates] serving as the spokes." (Rel. Resp. at 21.) Under this theory, Relator argues that Defendants "shared knowledge that all NBF-affiliated clinics are operating in the same fashion" and shared a "goal of defrauding the government programs" through coordinated actions, training and incentives. (Rel. Resp. at 21.)

The theory of conspiracy advanced by Relator has been recognized in the Ninth Circuit as "a 'wheel conspiracy' [that] involves 'a single member or group (the 'hub') separately agreeing with two or more other members or groups (the 'spokes')." *Anita Silingo*, 904 F.3d at 678. "[I]f a fraudulent scheme resembles a wheel conspiracy, then any parallel actions of the 'spokes' can be addressed by collective allegations." *Id*. Under this theory, Relator alleges in detail that NBF developed a scheme to induce patients to undergo balloon sinuplasties, to submit a claim for payment to Government programs for those procedures, and to create false records to support those claims. (*See* FAC ¶¶ 48–61.) That each affiliate joined the conspiracy by adopting those same fraudulent policies, procedures, and training designed to get false claims paid by the Government is sufficient to plead an FCA conspiracy claim.

Next, Defendants argue that the conspiracy claim fails as to the NBF and its executives under the intracorporate conspiracy doctrine. (Mot. at 30–31; Reply at 14.) "As

a practical matter, a corporation cannot conspire with its own employees acting within the scope of their employment, as their actions are already deemed the actions of the corporation." *U.S. ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1038 (C.D. Cal. 2012). While the Ninth Circuit has not addressed it, district courts have applied this doctrine to FCA claims. *See, e.g.*, *id.* (collecting cases); *United States v. Aerojet Rocketdyne Holdings, Inc.*, 381 F. Supp. 3d 1240, 1249 (E.D. Cal. 2019) (same).

In response, Relator does not attempt to distinguish Khanna, Ghanem, and Borane from NBF. Even if she had, Relator's First Amended Complaint suggests that those individual defendants are agents of NBF. (FAC ¶¶ 18–20.) Accordingly, the Court dismisses the conspiracy claim only as to against Khanna, Ghanem, and Borane, but not as to NBF because Relator has sufficiently alleged it has conspired with affiliates to defraud the Government. The Court grants Relator leave to amend the conspiracy claim as to Khanna, Ghanem, and Borane if this defect can be cured by additional facts. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

**IT IS ORDERED** granting in part and denying in part Defendants' Motion to Dismiss Amended Complaint (Doc. 38).

**IT IS FURTHER ORDERED** that Count Three alleging a violation of 31 U.S.C. § 3729(a)(1)(C) as to Defendants Dr. Manish Khanna, Nabiel Matthew Ghanem, and Taylor Borane is dismissed with leave to amend. Should Relator choose to amend this claim, Relator may file an amended pleading no later than fourteen days from the date of this Order in a manner that complies with Local Rule of Civil Procedure 15.1 not to exceed the scope of leave granted herein. Count Three as to the other named defendants and the entirety of Counts One and Two may proceed.

Dated this 4th day of June, 2026.

_____
Honorable John J. Tuchi
United States District Judge

- 20 -